729 So.2d 178 (1999)
May Crutchfield, wife of/and Peter VELA
v.
PLAQUEMINES PARISH GOVERNMENT.
Andrea Maxwell, wife of/and James R. Daigle
v.
Plaquemines Parish Government.
Evelyn Antoine Rose
v.
Plaquemines Parish Government.
John J. Vogt, III, Patty A. Vogt and Monica Vogt Wertz
v.
Plaquemines Parish Government.
Nos. 97-CA-2608 to 97-CA-2611.
Court of Appeal of Louisiana, Fourth Circuit.
March 10, 1999.
Rehearing Denied April 14, 1999.
*180 Stephen O. Scandurro, JeanPaul Layrisson, Timothy D. Scandurro, New Orleans, Louisiana, Counsel for Plaintiffs-Appellees.
L.V. Cooley, IV, Special Assistant Parish Attorney, Stephen C. Braud, Parish Attorney, Michael L. Mullin, Assistant Parish Attorney, Belle Chasse, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge WILLIAM H. BYRNES, III, Judge JOAN BERNARD ARMSTRONG and Judge JAMES F. McKAY, III.
BYRNES, Judge.
This is a class action brought to determine the amount of compensation due to hundreds of plaintiff landowners whose approximately seven hundred tracts of property, located in Plaquemines Parish, were appropriated by the defendant-appellant, the Plaquemines Parish Government ("PPG"), for use in a hurricane protection levee improvement project by the Corps of Engineers. The present appeal involves only the valuation of the property actually appropriated, which valuation the PPG complains is too high. Other issues remain to be tried.
The PPG contends primarily that the trial court employed erroneous legal theories in valuing the appropriated property.
The appropriations were accomplished through nine separate ordinances adopted by the PPG during the period from March 9, 1989 to October 3, 1991.[1] After construction of the levee project, several landowners filed separate actions for compensation and damages. Those actions were consolidated and later certified as a class action. The class action certification is not an issue in this appeal.
The issue of valuation of the appropriated parcels was tried without a jury. The parties stipulated that 1,948,568 square feet of land was appropriated, exclusive of lands belonging to government entities and to those who opted out of the class. The parties could not agree on whether an additional 450,235 square feet in the Duvic to Venice area had also been appropriated. That issue along with those related to severance damages to remainder parcels, interests, costs and attorney fees were deferred for later trial. There is no dispute that the landowners are entitled to some amount of compensation.
The trial judge awarded $1.00 per square foot of property to owners of parent parcels *181 without improvements and $1.35 per square foot to owners of parent parcels containing improvements. The judgment of the trial court awarded interest from the dates of the nine various appropriations. The appellant does not challenge those dates. In support of these awards the trial court issued impressive written reasons that are exceptionally thorough, detailed and logically constructed. It is tempting to merely adopt those reasons as the reasons of this Court. We do not craft this opinion on appeal from scratch because we believe that we have succeeded in improving upon the excellent work of the trial court. We have chosen to go with an original opinion of our own devising in order to focus more sharply on those issues that the parties have identified as being of greatest concern to them; in order to let the litigants know that we recognize that this case is complex, difficult and unusual; and in order to give the Supreme Court, should either party apply thereto for a review of this ruling, the benefit of having the same reasoning expressed in two different ways.
None of the appropriated lands are batture lands. All of the appropriated parcels are vacant land without improvements; but some of the parent parcels, and thus some of the remainder parcels, do have improvements. There is considerable variation among the parent parcels in terms of both their size (i.e. area) and their depth. Of the approximately seven hundred appropriated parcels, only a few were appraised individually. Apparently, this was because seven hundred appraisals would have cost more than a million dollars. Each side relied upon "mass" appraisals, to arrive at per square foot values of the appropriated parcels. There was considerable difference between the valuation positions taken by each side.
Appropriation of land for levee purposes differs from the expropriation of property for public purposes. Appropriation is the exercise of a pre-existing but previously unexercised public right (the levee servitude in the instant case) to property, whereas expropriation is the effort to acquire new public rights to property possessed by a private owner. Riparian lands, i.e., lands fronting on rivers and streams, have been burdened with a public servitude for levees ever since the land was first separated from the public domain. Consequently, when the public exercises its levee servitude on riparian land, there is no "taking," within the meaning of the Fifth Amendment of the Constitution of the United States (made applicable to the states by the Fourteenth Amendment) and Article I, Section 4 of the 1974 Constitution of Louisiana, for which "just compensation" must be paid. DeSambourg v. Board of Commissioners, 621 So.2d 602, 606-607 (La. 1993).
Although there is no historical Fifth Amendment imperative to provide compensation in appropriation situations as opposed to expropriation situations, in more recent years Louisiana has adopted both constitutional and statutory provisions requiring compensation in appropriation cases such as the one now before this court. DeSambourg, 621 So.2d at 608; La. Const. art. 1 § 4 (1974); LSA-R.S. 38:301 C(1)(a).
LSA-R.S. 38:301 C(1)(a) calls for a "fair market value" standard for compensation. LSA-R.S. 38:281(3) defines fair market value by referring to LSA-R.S. 47:2321 et seq., which defines fair market value as "the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances ... "[Emphasis added.]
Consistent with the jurisprudence, both sides maintain that the "market approach," as described in LSA-R.S. art. 47:2321, making use of comparable sales to determine fair market value, is most appropriate. E.G., West Jefferson Levee District v. Coast Quality Construction Corporation, 93-1718 (La.5/23/94); 640 So.2d 1258, 1272 n. 23. Both sides presented expert testimony by appraisers who had made use of comparables to arrive at values per square foot which could then be applied to the appropriated parcels to perform what the parties refer to as a "mass appraisal." Both parties accede to the use of the "mass appraisal" approach.
The first issue on appeal results from the fluctuation over the course of about sixteen years in the economy of Plaquemines *182 Parish. During 1987-91 the economy of Plaquemines Parish contracted sharply when contrasted with the years immediately preceeding and following this period. The appropriations occurred during this period of severely depressed land values. Plaintiffs do not contend that there were any sinister motives behind the timing of the appropriations, but contend that their land should not be valued based on comparables from that time period. Plaintiffs contend that the land values at the time of the appropriations were abnormally low based on an anomalous and aberrant economic situation, i.e., the unusually depressed economy at that time was not reflective of "usual and ordinary circumstances" as called for in LSA-R.S. 47:2321. Accordingly, plaintiffs contend that comparables from 1981-85 and from 1991 to the date of the trial in 1997 are a more accurate reflection of the valuation of the appropriated land under "usual and ordinary circumstances." PPG countered by arguing that "usual and ordinary circumstances" does not refer to the time of the appropriation but is limited to negotiation conditions existing between the proverbial "willing buyer" and "willing seller", and that valuation must always be based on the market at the time of the appropriation.
The interpretation of the phrase "usual and ordinary circumstances" is a question of law which we review on appeal de novo. The legal question before this court is whether "usual and ordinary circumstances" may include economic conditions that might exist for a period of time. To put it another way, is it possible that economic conditions might exist for a period of time that are so unusual and extraordinary that they could not be considered "usual and ordinary circumstances" as called for in LSA-R.S. 47:2321.
Several expropriation cases make the statement that the valuation must be based on the date of the expropriation, and we agree that that is the accepted practice in "ordinary and usual circumstances."
In Grand Prairie Levee District v. Caluda, 557 So.2d 373, 376 (La.App. 4 Cir.1990) this Court held that the date of expropriation was determinative. But the issue in Caluda was whether the property should be valued subject to a servitude for a public highway which the property owner contended had been abandoned. This Court found that the servitude had not been abandoned and that the property could not be valued at some unknown future date based on the uncertain possibility of abandonment in the future. The facts in Caluda are in no way applicable to the question of whether economic conditions can constitute unusual and extraordinary circumstances.
In West Jefferson Levee District v. Coast Quality Construction Corp., 93-1718 (La.5/23/94); 640 So.2d 1258, 1277, State, Through Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280, 282 (1964); State, Through Department of Highways v. Waterbury, 171 So.2d 790, 792 (La.App. 3 Cir. 1965); and Central Louisiana Electric Co. v. Mire, 140 So.2d 467, 474 (La.App. 1 Cir. 1962), where the courts make a general reference to the time of the expropriation when valuing the property, there is no contention that the circumstances were other than usual and ordinary. Consequently, although we acknowledge the analogy to expropriation cases in analyzing this issue, we find none that are dispositive of the issue.
Valuations made during a time period in which natural disasters may threaten are obviously not made at a time of usual and ordinary circumstances. Times of transitory aberrant economic conditions should be viewed in a similar manner, and nothing in the applicable legislative provisions suggests otherwise.
Therefore, we conclude as a matter of law, that where circumstances warrant, economic conditions may determine what are "usual and ordinary circumstances."
Having determined as a matter of law that economic conditions may be a valid basis for determining what "usual and ordinary circumstances" might be, a determination by the fact finder that economic conditions at the time of an appropriation were not "usual and ordinary," is a finding of fact subject to reversal by the reviewing court only for manifest error. In an expropriation proceeding, a trial judge's factual determinations as to value of property and entitlement to any *183 other types of damages will not be disturbed on review in the absence of manifest error. West Jefferson Levee District v. Coast Quality Construction Corp., 93-1718 (La.5/23/94); 640 So.2d 1258, 1277. The same rule applies to factual determinations of value where appropriation is involved.
Accordingly, the finding of the trial court that the economic conditions that existed in Plaquemines at the time of the appropriations were extraordinary, is a finding of fact that should not be disturbed on appeal in the absence of manifest error. That is not to say that had this Court been the original finder of fact that we would necessarily reach the same conclusion. But we can say that the several year time period involved in the economic conditions on which the trial court's finding is based, is at the extreme outer limit of what the legislature could have contemplated as economic conditions that are not "usual and ordinary circumstances." We recognize that at some point in time a period of depressed values may become so protracted as to assume a degree of normalcy. However, in the absence of a bright line of demarcation we cannot say that the trial judge was manifestly erroneous in concluding that the time period of depressed values in Plaquemines was sufficiently short as to be considered transitory and anomalous. This is a very close case in which the deference we owe to the trial court is crucial. Accordingly, we limit this holding to these facts.
Our decision is influenced by the fact that the provisions requiring compensation for the landowner of appropriated land grew out of a sense of fairness and justice, not the constitutional imperative of the "takings" clause. Concomitant with such motives for compensation is the recognition by this Court that the landowner is powerless to control the timing of the appropriation. "Willing buyer and willing seller" is the famous catchphrase in the field of market valuations. This catchphrase applies even where the landowner is under the compulsion of appropriation, because it does not refer to the particular landowner in question, but to the action of the hypothetical landowner acting in the absence of legal compulsion. Individual personal reasons why a landowner may not wish to sell at a given moment are not relevant. However, where the market is so unstable and depressed relative to normal times that it can be presumed that not even the hypothetical landowner (or in the instant case, the entire plaintiff class of landowners) would chose such a time to sell, then "usual and ordinary circumstances" do not exist.
Dr. Aguilar, qualified as an expert for the plaintiff, testified that under the extraordinarily depressed conditions that existed at the time of the appropriations, willing and informed sellers would take their property off the market. Under such conditions, according to Dr. Aguilar, a proper valuation would "smooth out the peaks and the valleys."
The definition of "market value" called for in LSA-R.S. 47:2321 differs significantly from that used in standard appraisal practice. As we have already noted, 47:2321 calls for "usual and ordinary circumstances," but the standard appraisal definitions used in the appraisal reports found in the record refer instead to "all conditions requisite to a fair sale." The standard appraisal definitions of market value found in the appraisal reports in the record call for "the most probable price," whereas 47:2321 calls for "the highest price." The legislative definition of market value found in 47:2321 is clearly more favorable to the landowner than what appears to be the standard appraisal report definition. This only makes it that much more difficult for the PPG to justify overturning the valuations made by the trial court based on arguments of excessive valuations. We may assume that this definitional bias in favor of the landowner represents the legislative recognition of the non-consensual nature of the appropriation process in contrast to the standard appraisal approach which presupposes a fully consensual transaction in all aspects of the transaction. The reference in 47:2321 to a "willing and informed buyer and a willing and informed seller" is modified by the references to "usual and ordinary circumstances" and "highest price," definitional modifications not found in the standard form market value definitions used in the appraisal reports found in the record.
*184 This is not the same as saying that landowners are entitled to have compensation measured by peak values. "Highest price" is not the same as peak value. "Peak" refers to market conditions, whereas "highest price" refers to a price within market conditions. We will not presume for appropriation purposes that the landowners sold at the top of the market - unless, of course, the top of the market is chosen because it coincidentally occurred during the applicable time period. If it is determined that a landowner is to be compensated based on values existing at a time the market peaked, then the landowner is entitled to the "highest" of those peak values. However, if landowner's compensation is determined to be based on a non-peak period, then the landowner is entitled to the "highest" price available during the non-peak period. The landowner is not entitled under such circumstances to use peak values.
All of the foregoing assumes that the valuations are undertaken during times that could be described as "usual and ordinary circumstances." But where market conditions at the time of appropriation are found not to be usual and ordinary, evidence of valuations from other times may be offered if, but only if they can be shown to be reflective of what the valuation on the date of the appropriation would be, had usual and ordinary circumstances existed in the marketplace. Transitory depressed valuation is a matter of judgment of experts in reaching value. Hobgood v. Parish of East Baton Rouge, 563 So.2d 413, 418 (La.App. 1 Cir. 1990).
Plaintiffs' experts testified that the time of appropriation was a time of transitory depressed valuation and the trial court agreed. The testimony of the expert appraiser for the PPG, Mr. Eppling, confirmed this when he answered affirmatively when asked if the market at the time of the appropriations were a time that was "very speculative and very scary and very inaccurate." [Emphasis added.] Mr. Eppling went on to testify that:
A I will tell you what happened. I was doing work for banks at the time and I just stopped doing work because I felt that the banks were absolutely wrong, you know, in appraising something every thirty days or sixty days or ninety days. So, there was a lot of work that I turned down because I didn't get involved in it.
Q But, in bank sales of properties, did you find them dumping properties of 10 to 30 [cents] on a dollar below their value?
A I would say, yes. I did see some instances where they were just dumping properties. Yes.
Where even the expert for the PPG testifies, in effect, that contemporaneous appraisals on any given day during this period of economic instability and depression would not be reflective of value, and that properties were being "dumped" at prices that were not reflective of value (which is bound to have a ripple effect on other sales and appraisals) it lends that much more credence to the conclusion that "usual and ordinary circumstances" excludes anomalous economic conditions, and that the conditions that existed at the time of the appropriations that are the subject of this suit were anomalous.
Accordingly, after reviewing the record as a whole, we cannot say that the trial court was manifestly erroneous in factoring in values falling outside of the appropriation time frame.
A second issue raised on appeal relates to the fact that the approximately 700 parent parcels varied considerably in size. The PPG's appraisal expert witness, Mr. Eppling, arranged the comparables that he used into categories based upon depth with deeper tracts having a lesser value per square foot (although they could have a greater total value). The landowners' principal appraisal expert witness, Ms. Hazel, arranged the comparables that she used into categories based upon area with tracts having greater area having a lesser value per square foot (although, again, they could have greater total value). Thus, generally speaking, both the PPG's appraisal expert witness and the landowners' appraisal expert witness agreed that the unit value (value per square foot) of the parent parcels varies with size. Both appraisers agree that smaller parent parcels have higher unit values and that larger parent parcels have lower unit values.
*185 Despite the general agreement of the appraisal expert witnesses that the unit value of the parent parcels varied with their size, the trial court decided to value all of the appropriated parcels with the same unit value based on an average applied across the board. Although the per unit value of each piece should normally be determined individually, the approach taken by the trial court was justified in this case where the PPG failed to undertake contemporaneous individual appraisals and the court was forced to rely on "mass" after the fact appraisals.
The average approach to per unit value represents a reasonable approximation of value, where, as the trial judge noted in his written reasons for judgment, the alternative approach suggested by the PPG's expert, Mr. Eppling, would result in unjustifiably large fluctuations of value based on depth where the difference in depth between two parcels might be insignificant. Likewise, the per square foot categories suggested by Ms. Hazel, the plaintiffs' expert, also created unwarranted discrepancies in value based on insignificant differences in area. Faced with a record that provided no means of doing truly effective individual valuations, we feel that the trial judge was forced to make a choice among approaches all of which were at best approximations, and that the choice he made was reasonable.
A third issue relates to whether appropriated parcels should have a higher value placed upon them if their respective parent parcels have improvements upon them. None of the property actually appropriated had improvements. However, a number of appropriated parcels came out of parent parcels that had improvements. Mr. Eppling, the PPG's appraisal expert and Ms. Hazel the landowners' principal appraisal expert both used vacant land comparables to make their value determinations. However, Dr. Aguilar, testifying for the landowners as an expert witness in the field of "land acquisition," contended that the presence of improvements on land in Plaquemines Parish increases the value of the land by 27% to 57%. Based on this testimony, the trial court increased the value placed on the appropriated parcels from parent parcels with improvements by 35% over and above the value placed by Ms. Hazel on appropriated parcels from parent parcels without improvements. Implicit in the finding of the trial court is the conclusion that the landowners would not normally have sold the appropriated vacant parcels separately from the improved parent parcels voluntarily, and that the landowner is, therefore, entitled to have the appropriated vacant parcel valued as though it were still part of the improved parent parcel. Based on our review of the record as a whole, we cannot say that such implicit reasoning is manifestly erroneous.
Lastly, the trial court mentioned in its written reasons, almost as an afterthought, evidence of certain credits allowed the PPG by the Corps of Engineers. The expense of the levee improvement project is borne by both the PPG and the Corps of Engineers. The Corps allows credits to the PPG (not cash payments, but credits toward the amount of the cost to be borne by the PPG) for various expenses incurred by the PPG for the levee project. This includes some credit for land appropriation by the PPG. The Plaintiffs presented evidence of these credits. The trial court referred to this evidence as support for its conclusion that the amount of the compensation due under the valuations found by the trial court would "roughly equal" the credits to the PPG from the Corps. The PPG offered evidence to show that the credits would not nearly equal the amount of compensation due under the trial court's valuations ($0.38 per square foot for the credits versus the trial court's valuations of $1.00 and $1.35 per square foot). The trial court denied the PPG's motion to supplement the record with this evidence. As there is ample other evidence in the record to support the valuations of the trial court, we need not rule on this question.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] We will refer to the parcels of land from which portions were appropriated as the "parent parcels," the appropriated portions of the parent parcels as the "appropriated parcels," and the portions of the parent parcels not appropriated as the "remainder parcels."