811 So.2d 1263 (2002)
May Crutchfield, Wife of/and Peter VELA
v.
PLAQUEMINES PARISH GOVERNMENT.
John J. Vogt, III, Patty A. Vogt and Monica Vogt Wertz
v.
Plaquemines Parish Government.
Andrea Maxwell, Wife of/and James R. Daigle
v.
Plaquemines Parish Government.
Evelyn Antoine Rose
v.
Plaquemines Parish Government.
Nos. 2000-CA-2221 to 2000-CA-2224.
Court of Appeal of Louisiana, Fourth Circuit.
March 13, 2002.
Rehearing Denied April 16, 2002.
*1265 Timothy D. Scandurro, Stephen O. Scandurro, Jean-Paul Layrisson, Scandurro & Layrisson, L.L.C., New Orleans, LA, and Darryl W. Bubrig, Sr., Bubrig Law Office, Belle Chasse, LA, Counsel for Plaintiff/Appellee.
*1266 L.V. Cooley, IV, Special Assistant Parish Attorney, Belle Chasse, LA, Counsel for Defendant/Appellant.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge DAVID S. GORBATY.)
PATRICIA RIVET MURRAY, Judge.
This is the third appeal arising from the instant class action suit, which involves the appropriation by Plaquemines Parish, from 1989 to 1991, of approximately seven hundred tracts of privately-owned land for use in a hurricane protection levee enlargement project. In Vela v. Plaquemines Parish Government, 94-1161 to 94-1164 (La.App. 4 Cir. 6/29/95), 658 So.2d 46 ["Vela I"], this court affirmed the certification of the class. Then, in Vela v. Plaquemines Parish Government, 97-2608 to 97-2611 (La.App. 4 Cir. 3/10/99), 729 So.2d 178 ["Vela II"], we affirmed the trial court's judgment fixing the value of the 1,948,568 square feet of land appropriated at $1.00 per square foot of land taken from parent parcels without improvements and $1.35 per square foot of land taken from parent parcels containing improvements. Our opinion in Vela II specifically deferred for later trial the contested issue of whether an additional 450,235 square feet of land in the Duvic to Venice area had been appropriated, as well as issues related to severance damage to remainder parcels, interest, costs and attorney fees.[1]Id. at p. 2, 729 So.2d at 180.
The instant appeal stems from these remaining issues. On May 18-21, 1998, seven property damage/severance claims arising from the Duvic to Venice area were tried. As these seven "bellwether" claimants represented a cross-section of the typical kinds of claims remaining to the class as a whole, the parties stipulated that they would make their best efforts to apply the factual and legal conclusions reached at that trial to other similarly situated claimants. That trial resulted in a judgment rendered August 16, 1999, which was modified by means of a second judgment rendered December 15, 1999, both of which are subjects of this appeal. Also part of this appeal are four additional judgments rendered on post-trial rules and motions: 1) August 16, 1999 judgment on plaintiffs' Rule to Tax Costs from the first phase of the bifurcated trial; 2) June 15, 2000 judgment on plaintiffs' Rule to Tax Costs from the second phase of the bifurcated trial; 3) June 15, 2000 judgment on plaintiffs' Motion to Fix Interim Statutory Attorney Fees; and 4) June 15, 2000 judgment on plaintiffs' Interim Motion to Classify Properties. All judgments are accompanied by extensive written reasons by the trial court. The defendant, the Plaquemines Parish government [hereinafter referred to as "PPG"], has appealed various aspects of these judgments, and the plaintiffs/property owners have both answered the appeal and cross-appealed on certain issues. For purposes of clarity, we address each judgment separately.

AUGUST 16, 1999 JUDGMENT AS MODIFIED DECEMBER 15, 1999
This judgment awarded specific amounts of compensation to seven plaintiffs who owned land in the Duvic to Venice area, namely:
*1267 1) Walter Blaize$12,051
2) James and Andrea Daigle$12,500
3) Dade Vincent$10,000
4) Gary and Mallory Mays$2,500
5) Arthur and Diana Battistella$1,000
6) M.J. Farac, Jr., and Sinajka Farac $6,200
7) Patty Vogt$48,500
The August 16, 1999 judgment also denied the plaintiffs' claims for compensation for lands appropriated within a previously existing sixty-foot road right of way, and denied their claims for compensation for damages to land occasioned by the construction of an "I-wall" within previously appropriated lands. On December 15, 1999, following a hearing on plaintiffs' motion for new trial, the trial court modified its judgment to withdraw its denial of the plaintiffs'"I-wall" damage claims and replace it with a denial of only the "I-wall" damage claim made by Arthur and Diana Battistella. In addition, the court certified that its August 16 and December 15 judgments were intended to be final, appealable judgments, regardless of the fact that there were other claims still pending in the lawsuit.
On appeal, the PPG argues that the awards of compensation to Walter Blaize, Gary and Mallory Mays, Arthur and Diana Battistella, and M.J. and Sinajka Farac are improper because none of these claimants had property actually appropriated from them, and therefore they are not members of the class. Further, the PPG argues that the portion of the award to Dade Vincent representing loss of rent and the portion of the award to Patty Vogt representing lost profits are improper because these items are not legally recoverable in an appropriation case. Finally, the PPG asserts that the award of compensation to the Battistellas for I-wall damage is improper. As cross-appellants, the plaintiffs assert that the Battistellas' I-wall damage is compensable, and that the claim for damages to appropriated land within a previously existing road right of way is also compensable.

(1) Awards to plaintiffs Blaize, Battistella, Farac, and Mays
We first address the PPG's contention that four of the claimants are not members of the class because they did not have property appropriated from them. Mr. Blaize, a riparian landowner, was awarded $7, 051 for damages to his home caused by the construction (a chimney separated from the house and there were cracks in the floors and ceilings).[2] Mr. and Mrs. Battistella, also riparian landowners, were awarded $1,000 to compensate for drainage problems on their property caused by the levee construction. Mr. and Mrs. Farac were awarded $5,000 for damages to their rental property and drainage problems on their riparian tract. Finally, Mr. and Mrs. Mays, who are not riparian landowners, were awarded $2,500 compensation for their home, which is adjacent to a major haul road used for the levee construction and was damaged by the heavy truck traffic.
In response to the PPG's argument, plaintiffs assert that three of these claimants, namely Walter Blaize, the Battistellas and the Faracs, did have property appropriated pursuant to the 1989-1991 resolutions, although no new rights of *1268 way or servitudes were taken from them.[3] Alternatively, plaintiffs contend that whether property was actually taken from any of these four claimants is irrelevant, because the applicable statute allows recovery for land or improvements that are merely "damaged." See La. R.S. 38:301 C(1)(a) and (1)(i). Plaintiffs also argue that the PPG cannot now contend that these claimants are not members of the class after acquiescing in their status as members throughout the past seven years of litigation.
The trial court apparently accepted the plaintiffs' two alternative arguments. In his Reasons for Judgment, he indicated that he was rejecting the PPG's contention that the landowners from whom no property was appropriated were not class members because "that issue has been previously resolved." He specifically noted that these plaintiffs had been identified as claimants, had been deposed by the PPG and had presented their claims during the prosecution of the suit; he then considered their claims individually and awarded each a measure of damages under the statute.
Although we find this issue to be somewhat more complex than expressed by the trial court, we conclude that the result reached by it comports with the law. Specifically, in the instant case, we conclude that it is unnecessary to determine whether property was "appropriated" from these claimants to affirm that they are proper members of the class and are entitled to damages under R.S. 38:301.
In Vela II, we explained the term "appropriation" as follows:
Appropriation of land for levee purposes differs from the expropriation of property for public purposes. Appropriation is the exercise of a pre-existing but previously unexercised public right (the levee servitude in the instant case) to property, whereas expropriation is the effort to acquire new public rights to property possessed by a private owner. Riparian lands, i.e., lands fronting on rivers and streams, have been burdened with a public servitude for levees ever since the land was first separated from the public domain. Consequently, when the public exercises its levee servitude on riparian land, there is no "taking" within the meaning of the Fifth Amendment of the Constitution of the United States (made applicable to the states by the Fourteenth Amendment) and Article I, Section 4 of the 1974 Constitution of Louisiana, for which "just compensation" must be paid. DeSambourg v. Board of Commissioners, 621 So.2d 602, 606-607 (La.1993).
Although there is no historical Fifth Amendment imperative to provide compensation in appropriation situations as opposed to expropriation situations, in more recent years Louisiana has adopted both constitutional and statutory provisions requiring compensation in appropriation cases such as the one now before this court. DeSambourg, 621 So.2d at 608; La. Const. Art 1 § 4 (1974); LSA-R.S. 38:301 C(1)(a).
Vela II, at p. 3, 729 So.2d at 181.
The PPG argues, and the trial court apparently accepted, that no property was actually appropriated from these four named claimants. With respect to three of them (Walter Blaize, the Battistellas and the Faracs), although the newly enlarged *1269 portion of the levee was not actually located on any part of their lands, we nevertheless find the issue of whether property was "appropriated" from them to be debatable. In the instant case, the appropriations were accomplished through nine separate ordinances adopted by the PPG during the period from March 9, 1989 to October 3, 1991. See Vela II, at p. 1, 729 So.2d at 180. The plain language of the ordinances appropriated not only "new" rights-of-way, but also construction easements for equipment and removal of existing levees, borrow areas, stockpile areas, and construction areas as shown on United States Army Corps of Engineers maps, which included the entire levee, from north to south. Paul J. Griffin, who heads up Plaquemines Parish's Land Department, confirmed that he implemented the administration's policy, which was to appropriate all land from the Mississippi River water's edge to the outer western-most required right-of-way, including the prior existing levee, despite the fact that it was covered by a prior servitude. Accordingly, the PPG sent notices of appropriation to every landowner it could identify who had riparian property from City Price to Venice, including Walter Blaize, the Battistellas and the Faracs. The evidence at trial showed that at the time the ordinances were passed and the notices were sent, the PPG did not yet know which of these landowners would have property burdened by new rights-of-way. Moreover, when this information later became available from the Corps of Engineers maps, the PPG did not send follow-up notices to any of the previously notified landowners telling them either that their property was not being appropriated or that no new rights-of way were being taken.
The state's policy of compensating those whose property is adversely affected by appropriation is embodied in Article 6, Section 42 of the Louisiana Constitution of 1974.[4] The statute that implements this policy is La. R.S. 38:301, entitled "Construction and maintenance of levees and drainage; care and inspection of levees; measure of compensation; right of entry." It provides, in pertinent part:
C(1)(a) All lands, exclusive of batture, and improvements hereafter actually taken, used, damaged, or destroyed for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss.
(b) The owner shall be given written notice of the appropriating resolution... within ten days of its passage.
. . . .
(e) Notwithstanding any other provision to the contrary, the various levee districts shall also have the authority to appropriate land and improvements for temporary servitudes for levee construction purposes. As to these temporary servitudes, the "fair market value" shall mean the use value of the lands actually used for the period of time utilized by the appropriating agency.
(f) It shall be the duty of the appropriating agency to specify and delineate at the time of the appropriating resolution, whether areas taken shall be burdened with a permanent levee servitude or a temporary servitude for levee construction purposes.
(g) "Use" shall be deemed to occur at the time the levee board formally *1270 adopts its resolution specifically describing an area to be utilized for levees and levee drainage purposes through the exercise or acquisition of a permanent levee servitude or a temporary servitude provided that the actual use of the property commences within two years of the adoption of the resolution....
The term "appropriate" is not defined in the above statute, nor does it appear in the definitions section of the act. See R.S. 38:281. While we are unaware of any jurisprudence addressing this precise issue, several courts, including this one, have assumed, that the "appropriation" occurs when the resolution is passed. See, e.g., Board of Commisioners v. Percle, 535 So.2d 1240, 1246 (La.App. 3rd Cir.1988) ("The record reveals that the entire tract in question was appropriated by resolution of the Levee Board on September 4, 1940."); Vela II, at p. 1-2, 729 So.2d at 180-181 ("The appropriations were accomplished through nine separate ordinances adopted by the PPG during the period from March 9, 1989 to October 3, 1991.... The judgment of the trial court awarded interest from the dates of the various appropriations.") Moreover, the statute itself expressly provides that the "use" of the property shall be deemed to occur at the time the resolution is adopted, provided "actual use" commences within two years. R.S. 38:301 C(1)(g). Logically, we must interpret the term "actual use" to equate to the actual taking, use, damage or destruction for which the statute prescribes compensation. See R.S. 38:301 C(1)(a), (1)(c) and (1)(i). The evidence is unequivocal that each of these claimants sustained some damage to their property caused by the levee construction. Therefore, considering the broad use of the term "appropriation" in the statute, which encompasses both permanent servitudes and temporary servitudes for levee construction purposes, and the fact that plaintiffs Blaize, Battistella and Farac not only received official notice that their property was being appropriated, but also sustained damage from the levee enlargement project, we find merit in the plaintiffs' assertion that these three claimants did have property appropriated from them, despite the trial court's assumption to the contrary.
However, it is not necessary for us to make a determination on this issue. PPG argues that since no property was appropriated from plaintiffs Blaize, Battistella, Farac or Mays, these claimants are not proper members of the class. This argument is fallacious. In support of its argument, PPG relies on the plaintiffs' Second Supplemental and Amending Petition, filed June 28, 1993, in which the class representatives described themselves as parties "whose immovable property and improvements thereon were appropriated by Plaquemines Parish Government for purpose of the First Enlargement, New Orleans to Venice, Louisiana, Westbank Mississippi River Levee, Hurricane Protection Project and in respect to which construction of said project was completed on or after March 1, 1991." Citing this language, PPG argues that these representative plaintiffs had to prove during the damages phase of the trial that their property or improvements were "appropriated" in order to be considered members of the class. We disagree.
The word "appropriated," which PPG contends is crucial to the definition of the class, is not defined in any of the pleadings. As noted previously, there is also no definition of the term in the governing statute, only a provision that *1271 compensation is owed to landowners whose property is actually taken, used, damaged or destroyed for levee or levee construction purposes. Absent such a definition, there is no basis for PPG's assertion at this point in the litigation that these four claimants are not proper members of the class. In our opinion affirming the certification of the class, we noted that PPG did not deny plaintiffs' allegation that there were over 150 groups of affected landowners; these included some plaintiffs seeking only recovery for damages to structures on their property caused by the levee improvements. In approving the class certification, we found that there existed a common character among the rights of the representatives of the class and the absent members of the class. On appeal, the PPG does not deny that any of these four representative plaintiffs suffered damage to their property from the levee enlargement project; it merely argues that such damage is not compensable unless at least a portion of their property was "appropriated." We find, however, that in order to be proper class representatives, plaintiffs merely have to show that they have a claim for damages under R.S. 38:301 C, which explicitly allows recovery for land and improvements "taken, used, damaged or destroyed for levee or levee drainage purposes." The language of the statute is clearly disjunctive, meaning taken or used or damaged or destroyed.
Moreover, we find that the PPG is estopped from claiming, at this point in this protracted litigation, that any of these four representative claimants do not qualify as members of the class. As the trial court noted in its reasons for judgment, "One of them was and always has been identified as a named plaintiff and class representative. The others were identified as claimants, were deposed, and their claims presented during the prosecution of the suit." We therefore reject the PPG's argument that the awards to Walter Blaize, Mr. and Mrs. Battistella, Mr. and Mrs. Farac, and Mr. and Mrs. Mays must be reversed because these claimants are not proper members of the class, and we affirm the judgment with respect to those awards.

(2) Awards to plaintiffs Vincent and Vogt
The PPG next argues that the awards to Dade Vincent and Patty Vogt should be reduced because loss of rent and lost profits are not compensable damages in an appropriation case.[5] The trial judge characterized this argument as "untenable;" after reviewing the statutory law and jurisprudence, we agree.
R.S. 38:301 C(1)(a) states that lands and improvements actually taken, used, damaged or destroyed "shall be paid for at fair market value to the full extent of the loss." (Emphasis added). Plaintiffs contend that the legislature's use of the term "full extent of the loss" with reference to appropriation in R.S. 38:301 is significant because that same term has been considered by numerous courts in expropriation cases and has repeatedly been held to include compensation for business losses. See, e.g.: Layne v. City of Mandeville, 633 So.2d 608 (La.App. 1st Cir.1993); Avenal v. State Department of Natural Resources, 99-0127, p. 6 (La.App. 4 Cir. 3/15/00), 757 So.2d 1, 11. On the *1272 other hand, the PPG argues, without citing any authority, that the legislature intended for the measure of compensation in appropriation cases to be different from that in expropriation cases. Neither the statutory law nor the jurisprudence supports the PPG's viewpoint.
R.S. 38:281, the "definitions" section of the act which includes R.S. 38:301, provides, in pertinent part:
(3) "Fair market value" means the value of the lands or improvements actually taken, used, damaged or destroyed for levees or levee drainage purposes as determined in accordance with the uniform criteria for determining fair market value as defined in R.S. 47:2321 et seq.
(4) "Full extent of the loss" shall not be construed to include payment for uses which are remote, speculative, or contrary to law; uses for which the property is still suitable; or elements of property ownership which are not actually taken, used, damaged, or destroyed for levees or drainage purposes.
By expressly adopting the uniform criteria for determining fair market value found in R.S. 47:2321, which is contained in the general part of the Revised Statutes pertaining to revenue and taxation, the legislature evidences an intention to equate compensation for appropriated property with compensation owed by the state in other types of property cases. R.S. 47:2321 defines "fair market value" as follows:
Fair market value is the price for property which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used.
Moreover, we agree with the plaintiffs' assertion that the statute's deliberate incorporation of the term "full extent of the loss" indicates an intent on the part of the legislature to include in the measure of compensation for appropriation all the elements encompassed by that term as it has been jurisprudentially defined in Louisiana. Article 1, section 4 of the Louisiana Constitution mandates that one whose property is expropriated "shall be compensated to the full extent of his loss." In Layne v. City of Mandeville, supra, the court summarized the jurisprudence interpreting this term as follows:
To compensate an owner for the "full extent of his loss," Louisiana courts have awarded compensation for business-related losses.... The Louisiana Supreme Court extended the award of business losses to include not only present losses, but also estimated future losses. The right to use property for business pursuits in hope of generating a profit is clearly a right which flows from property ownership.
633 So.2d at 611-612 (Citations omitted).
Although the PPG argues strenuously that Layne and other cases relied upon by plaintiffs are distinguishable because they involve expropriation rather than appropriation, this distinction is a technical one that no longer has any bearing upon the determination of the proper measure of compensation. As our esteemed colleague Judge Lobrano so succinctly explained in Tenneco Oil Co. v. Board of Commissioners, 567 So.2d 113 (La.App. 4th Cir.1990):

*1273 Prior to the adoption of the 1974 Constitution, compensation for the taking of property [for levee purposes] was limited to its assessed value for the preceding year. The compensation provided by the 1921 Constitution has been characterized as a mere gratuity on the theory that a riparian landowner historically owed a legal servitude for levee purposes, thus "just compensation" as required in other takings was not necessary....
. . . .
With the adoption of the 1974 constitution, however, the measure of compensation was changed....
... [Act 314 of 1978] ... provided that compensation for lands and improvements actually used, damaged or destroyed for levees or levee drainage purposes would be at fair market value of the full extent of the loss....
In 1995, the legislature amended and reenacted the entirety of Chapter 4 of Title 38 of the Revised Statutes relative to levees and levee districts. However, the ... measure of compensation initiated by Act 314 of 1978 was not changed
. . .
This court is satisfied that as of at least July 10, 1978, the measure of compensation for lands and improvements used or taken for levees and/or levee purposes is fair market value. Although the riparian landowner still owes the legal servitude ... the public (i.e. state, levee board) can no longer exercise that servitude without payment of just compensation....
Id. at 115-116 (Emphasis added; citations omitted; footnotes omitted).
Judge Lobrano concluded by noting:
Although when referring to levee servitudes the word "appropriation" constantly appears in the Constitution (Art. 1, Sec.4, Art. 6, Sec.42) and in R.S. 38:301, that terminology is no longer correct insofar as it refers to a taking without compensation. More appropriately, it should be termed "expropriation."
Id. at 116 n. 7.
We therefore reject the PPG's contention that the term "full extent of the loss" in R.S. 38:301 should be narrowly construed to eliminate compensation for economic losses. Our view is supported not only by the jurisprudence, but also by generally recognized codal principles of statutory interpretation, such as that laws on the same subject matter should be interpreted consistently with each other. La. Civ.Code art. 13. For example, if economic losses were not to be compensated at all under R.S. 38:301, there would be no need for the legislature to prohibit payment in R.S. 38:281(4) for those uses of property that are "remote, speculative, or contrary to law."
We find no legal justification for adhering to an unprecedented, strict interpretation of the term "fair market value to the full extent of the loss" in this appropriation case. Indeed, we faced a similar issue in Vela II regarding the interpretation of the term "under usual and ordinary circumstances" in R.S. 47:2321, and reached a similar conclusion. In adopting the more liberal interpretation favoring increased compensation to the plaintiffs, this court explained:
Our decision is influenced by the fact that the provisions requiring compensation for the landowner of appropriated land grew out of a sense of fairness and *1274 justice, not the constitutional imperative of the "takings" clause.
Vela II at p. 7, 729 so.2d at 183.
Accordingly, the trial court did not commit legal error in awarding lost profits to Patty Vogt, whose crops and citrus orchard were partially destroyed by the obstruction of drainage ditches caused by the levee work; nor did the court err in awarding Dade Vincent the loss of rental value of a house on his property, which he had continuously rented to the same occupant since 1979 and which was damaged such that the costs of repair exceeded the amount of the permanent rental loss. We therefore affirm these awards.

(3) "I-wall" Claims
Contemporaneous with the levee enlargement project, the Corps of Engineers erected an "I-wall" consisting of sheet piling driven into the crown of the existing levee in order to raise its level for flood protection. Various landowners, represented by plaintiffs Mr. and Mrs. Battistella, made claims for diminution in value of their adjacent property because of the visual and aesthetic impact of this wall. In addition, Walter Blaize, who owned and operated a marina on the batture or river side of the levee, claimed damages for loss of access to his marina. The trial court awarded Mr. Blaize $5,000, but denied the other I-wall claims based on two specific provisions of R.S. 38:301 C(1), which state:
(c) Payment by federal, state, or local government, under existing or prior law, for the loss of lands or improvements used, damaged, or destroyed for levee or levee drainage purposes shall constitute payment in full for the exercise of a permanent levee servitude as provided by law over the lands and improvements when taken, used, damaged, or destroyed. No additional payment shall be due the owner for future work performed on, or the future taking, use, damage or destruction of, the same land or improvements over which the permanent servitude is taken and for which any compensation has been paid, for levee or levee drainage purposes.
(d) The term "same lands or improvements" shall include, but not be limited to, the levee servitude right-of-way, borrow areas, and areas determined to have been depreciated in value from the former use, drainage, or destruction for levee or levee drainage purposes.
The levee on which the I-wall was constructed was not the subject of any of the nine appropriating resolutions which form the basis of this lawsuit; it sits on land appropriated from some of the plaintiffs for a prior levee construction/ enlargement project during the 1970's. In denying the claims, the trial court found that the claimants had been previously compensated for the taking for levee purposes of the property on which the wall is located, and further, that the claimants were "bound to suffer [Civil Code] article 668 work on adjoining property." (No explanation is given by the trial court for the fact that he nevertheless awarded Mr. Blaize damages for diminution in its property value due to the I-wall's blocking of the former access to his marina.)
Subsequent to the initial judgment, the trial court granted plaintiffs' motion for new trial on this issue, and rendered a modified judgment replacing the denial of all the I-wall claims (except that of Blaize) with a denial of only the claim made by representative claimants Mr. and Mrs. Battistella, based on evidence at trial that the Battistellas had in fact received payment *1275 at the time the prior servitude was taken.
On appeal, the plaintiffs argue that all the I-wall claims should have been allowed, because the construction of the I-wall was not anticipated at the time of the earlier servitude and therefore no property owner could have been paid then for the damage occasioned by it. The PPG counter argues that all the claims represented by the Battistellas should have been rejected, and that evidence of prior payment is not necessary to support this rejection. The PPG bases its argument on the fact that section C(1)(c) was added to R.S. 38:301 by Act 785 of 1985, and expressly applies only to land and improvements appropriated after its effective date. Id., section C(1)(i). Because the I-wall is entirely constructed on land appropriated in the 1970's, any claim for damages has long since prescribed. In addition, with regard to Mr. Blaize, the PPG argues that the evidence at trial does not support the trial court's conclusion that he suffered any damage by losing access to his marina, as he was provided alternative access.
Although this is a novel issue upon which there is little guidance, we agree that the express wording of R.S. 38:301 C (1)(c) can only be construed as precluding recovery to the Battistellas for additional damages caused by the I-wall because the I-wall is constructed wholly on land subject to a prior appropriation, for which the Battistellas were already compensated. Although he found that the I-wall was a definite impediment to the enjoyment of the affected property, the trial judge correctly determined that there was no basis for awarding damages under R.S. 38:301.
The plaintiffs nevertheless argue that because the Battistellas were not specifically compensated for the diminution in value of their remaining property caused by the wall, the statute does not preclude them from receiving compensation now. They claim that section (1)(d) of the statute supports their argument, as there is no evidence that the prior compensation included payment for the diminished value of their remainder tract caused by the former use of the appropriated parcel. In essence, plaintiffs are arguing that the I-wall constitutes a new use, or taking, of the same property, which new use has caused further damage to the remainder tract.
We cannot accept this argument, because to do so would render meaningless the express provisions of R.S. 38:301 C(1)(c) and (d), which clearly evidence a legislative intent that the appropriating authority be required to pay only once for the levee servitude and the ensuing damage caused by it, regardless of what further work may be done in the future. Therefore, despite the evidence that the I-wall has indeed caused additional damage, we cannot substitute our judgment for that of the legislature, which has decided that such damage is not compensable.
With regard to the PPG's contention that the trial court erred in modifying the initial judgment to limit its denial to the Battistella claim alone, we find that the trial court was correct. The PPG contends that payment is not a prerequisite to the denial of the I-wall claims because that particular section of the statute (38:301 C(1)(c)) did not exist at the time of the 1970's appropriation. Plaintiffs' I-wall claims, however, are based on their assertion that the 1989-91 levee enlargement project, during which the I-wall was constructed, caused them additional damage. The claims must therefore be judged according to the version of R.S. 38:301 that applies to the 1989-91 appropriations. Accordingly, *1276 the trial court rejected the claims because the current statute precludes compensation for further work done on land previously appropriated and already paid for. If, as the PPG contends, there can never be a claim for further work done on previously appropriated property because such a claim would have prescribed, there would be no need for R.S. 38:301 C(c) and (d) to exist. Moreover, if plaintiffs were claiming damages resulting from levee work performed on previously appropriated property for which they had not been compensated, the statute would not preclude recovery, as it expressly requires payment. Therefore we conclude that the trial court correctly limited its ruling to the Battistellas.[6]
Regarding the claim of Mr. Blaize, the record contains no evidence of payment from the 1970's appropriation. However, we agree with the PPG that his own testimony confirmed that he actually suffered no economic loss and no actual damage as a result of the moving of the access to his marina from one location to the other. Mr. Blaize testified that he owned two separate parcels of land, one containing a house and the other containing a marina on the batture side of the levee. The marina has existed for approximately forty years. Prior to the building of the I-wall, Mr. Blaize and his customers had access to the marina by means of a shell road over the levee on Mr. Blaize's property. After the I-wall was constructed, this access was blocked and the only way of reaching the marina was over an adjacent road owned and maintained by the parish. A photograph introduced at trial showed both the remnants of the former road and the new road. Mr. Blaize admitted, however, that he had not suffered "any monetary loss to speak of," that he had in fact experienced "no loss of income," but that he felt that the new arrangement was "a little inconvenient.". Significantly, there was no testimony confirming that Mr. Blaize's property had diminished in value because of the lack of access to the marina from his own land. Mr. Blaize testified, however, that he feared he would not be able to sell his property because he did not have any legal documentation granting him access; nevertheless, he confirmed that the parish had never denied or threatened to deny him access to the marina. The PPG claims that the trial court erred in awarding $5,000 because Mr. Blaize failed to meet his burden of proving that his property was devalued to that extent. We agree. Without any evidence of actual diminution in value, Mr. Blaize's concern that he might not be able to sell his marina property is too speculative to support an award of damages. Accordingly, we conclude that the trial court committed manifest error in awarding Mr. Blaize $5,000 for diminution in his property value because the record does not support that there was any diminution.
Accordingly, we affirm the trial court's December 15, 1999 revised judgment denying the I-wall claim of Arthur and Diana Battistella. We also modify the August 19, 1999 judgment by reducing the amount awarded to Walter Blaize from $12,051 to $7,051, which reflects the deletion of the $5,000 awarded him by the trial court for damages occasioned by the I-wall.

(4) Damages to land appropriated within pre-existing right-of-way
On cross appeal, plaintiffs contend that the trial court erred by denying compensation *1277 for a strip of land located within a preexisting sixty-foot road right of way; this property was appropriated by Plaquemines Parish in 1975 for a Venice levee enlargement and setback project. The parties dispute whether this property was "reappropriated" in association with the 1989-91 project. However, it is undisputed that the land, which was formerly used for a road, is now part of the enlarged levee as a result of the 1989-91 project. The plaintiffs argue that this use constitutes a new servitude for which the landowners are owed additional compensation. They further argue that such use is compensable because the PPG failed to introduce any evidence of payment for the prior servitude. In rejecting the plaintiffs' claim, the trial court reasoned that no new infringement was being imposed upon the landowners.
Although the trial court in its reasons for judgment went to great lengths to distinguish the cases relied upon by plaintiffs on the legal grounds, such an analysis is unnecessary. In essence, the trial court found that there was no recovery owed these landowners because they were not damaged by the change in use of the property, a finding of fact subject to the manifest error standard of review. The only evidence of damage was the testimony of plaintiffs' expert, Dr. Aguilar, that the typical way to estimate damage to property which is the subject of a preexisting servitude is to assume that 90% of the fair market value has been previously impaired by the servitude, leaving 10% subject to additional compensation. Dr. Aguilar then opined that 10% of the fair market value of this property was equivalent to $17,500. This testimony does not, in our view, constitute evidence that this property was actually damaged, in the sense of actually suffering a diminution in value, by having its use changed from a road to a levee. Accordingly, we cannot say that the trial court committed manifest error in concluding that there was no compensable damage suffered by these landowners. The portion of the original judgment denying plaintiffs' claim and finding in favor of the PPG on this issue is therefore affirmed.

JUNE 15, 2000 JUDGMENT ON INTERIM MOTION TO CLASSIFY PROPERTIES
In what borders on a completely frivolous argument, the PPG challenges the trial court's interpretation of the judgment it rendered June 3, 1997 in the first phase of the damages trial, as reflected in the June 15, 2000 judgment granting Plaintiffs' Interim Motion to Classify Properties. The purpose of the first damages trial was to determine the value of property actually taken for the levee enlargement. The evidence at trial indicated that the fair market value of the property taken was greater if the tract from which it was taken (the "parent" tract) contained improvements than if the parent tract was vacant land. It was undisputed that no improvements were located on the square footage actually taken for the levee. Accordingly, the trial court rendered judgment on June 3, 1997 setting a value of $1.00 per square foot if there were no improvements on the parent tract and $1.35 per square foot if the parent tract contained improvements. That judgment reads, in pertinent part:
Property owners of land appropriated upon which no immovable structures or improvements were located at the time of the appropriation are awarded the sum of ONE AND NO/100 ($1.00) DOLLARS per square foot of land appropriated.
Property owners of land appropriated upon which immovable structures or improvements *1278 were located at the time of the appropriation are awarded the sum of ONE AND 35/100 ($1.35) DOLLARS per square foot of land appropriated.
The PPG appealed that judgment on the merits, and this court affirmed in Vela II. The Supreme Court denied writs on September 3, 1999.[7]
Subsequent to the appeal, the plaintiffs were required to establish the classification of each tract of property as improved or unimproved and submit that analysis to the trial court, which plaintiffs did by filing their Interim Motion To Classify Properties. The trial court then granted that motion and rendered judgment on June 15, 2000, establishing a final judgment value[8] so that the first judgment could be funded and paid. Appealing the June 15 judgment, the PPG now argues that the above-quoted language of the June 3, 1997 judgment does not support the award of $1.35 per square foot to any landowner. The PPG now contends that each and every affected landowner is entitled to only $1.00 per square foot, arguing that the term "land appropriated" in the 1997 judgment means that for a landowner to be entitled to $1.35 per square foot, the improvements would have to be literally sitting on top of the strip or portion of his land actually taken for the levee. According to the PPG, any contrary interpretation of the 1997 judgment would constitute a "substantive" amendment of that judgment which is prohibited by Louisiana Code of Civil Procedure article 1951.
The trial court characterized the PPG's argument as "spurious at best, sanctionable at worst," and we agree. The language of the 1997 judgment is clear and up to this point in time, its meaning has been understood and accepted by all parties to this litigation, by the trial court itself, and by this court, which considered it on appeal. In Vela II, this court stated:
A third issue relates to whether appropriated parcels should have a higher value placed upon them if their respective parent parcels have improvements upon them. None of the property actually appropriated had improvements. However, a number of appropriated parcels came out of parent parcels that had improvements.... Based on [the] testimony, the trial court increased the value placed on the appropriated parcels from parent parcels with improvements by 35% over and above the value placed by Ms. Hazel on appropriated parcels from parent parcels without improvements. Implicit in the finding of the trial court is the conclusion that the landowners would not normally have sold the appropriated vacant parcels separately from the improved parent parcels voluntarily, and that the landowner is, therefore, entitled to have the appropriated vacant parcel valued as though it were still part of the improved parent parcel. Based on our review of the record as a whole, we cannot say that such implicit reasoning is manifestly erroneous.
Vela II, at p. 12-13, 729 So.2d at 185.
The PPG chose to appeal the 1997 judgment on its merits, and did not raise this *1279 issue of semantics until after the judgment had been affirmed and was being made effective by the trial court's granting of the Interim Motion to Classify Properties. As we stated in our discussion of the PPG's contention that some of the representative claimants herein did not have property "appropriated" from them, the word "appropriated" has been utilized extensively throughout this litigation without ever being precisely defined. We conclude that all parties understood the meaning of that word in the context of the 1997 judgment, and we reject the PPG's argument in this respect. We do not find that judgment to be unclear or ambiguous, nor do we find that the trial court erred in interpreting its own judgment when it granted plaintiffs' motion on June 15, 2000. Accordingly, we affirm the judgment of June 15, 2000.

JUNE 15, 2000 JUDGMENT ON MOTION TO FIX INTERIM STATUTORY ATTORNEYS FEES UNDER LA. R.S. 13:5111
The PPG challenges the trial court's judgment awarding the plaintiff class the sum of one million, five hundred thousand dollars ($1,500,000.00) in attorney fees plus interest, reserving the right of plaintiffs to apply for additional attorney fees under applicable law, and designating its ruling as a final, appealable judgment. The PPG contends that the amount awarded is too high and exceeds the amount of "reasonable attorney fees actually incurred" designated by La. R.S. 13:5111, which is the statutory authority for the award of attorney fees in an appropriation case. Specifically, the PPG contends that the trial court erred by including prejudgment interest in the amount it used when calculating attorney fees based on a percentage of the judgment value; and alternatively, that the trial court erred by applying a multiplier, as is commonly done in class actions, when calculating attorney fees based upon the actual time spent pursuing the litigation.
Plaintiffs emphasize the unique, hybrid nature of this litigation (it is both a suit for compensation for land taken for public purposes and a class action), and that because of it, there are two distinct, unrelated statutory bases for the award of attorney fees: R.S. 13:5111 and Louisiana Code of Civil Procedure article 595. Plaintiffs argue that both provisions require the court to determine a "reasonable" fee, which the trial court did under the special circumstances of this case.
Plaintiffs sought attorney fees of $1,636,207.06, or one third of the total judgment value as of March 31, 2000, based on their one third contingency fee contract with their counsel. The trial judge specifically considered both provisions of law, as well as the unusual nature of the litigation, in determining the fee.
R.S. 13:5111, entitled "Appropriation of property by state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription" provides, in pertinent part:
A. A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding....

*1280 B. The rights of the landowner herein fixed are in addition to any other rights he may have under the constitution of Louisiana and existing statutes....
Article 595, which is contained in the section of the Code of Civil Procedure dealing with class and derivative actions, provides, in pertinent part:
A. The court may allow the representative parties their reasonable expenses of litigation, including attorney's fees, when as a result of the class action a fund is made available, or a recovery or compromise is had which is beneficial, to the class.
The leading case interpreting R.S. 13:5111 is Rivet v. State, 96-0145 (La.9/5/96), 680 So.2d 1154, in which the Supreme Court discussed the standard for appellate review of an award of attorney fees as follows:
Regardless of the language of the statutory authorization for an award of attorney fees or the method employed by a trial court in making an award of attorney fees, courts may inquire as to the reasonableness of attorney fees as part of their prevailing, inherent authority to regulate the practice of law. This court has previously noted that the factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge.
Id. at p. 11-12, 680 So.2d at 1161 (Citations omitted).
In his reasons for judgment, the trial court stated that under either statutory scheme, his task was to determine a "reasonable" fee. He found as a matter of fact that plaintiffs had documented over 2,500 hours of service by their attorneys, plus more than 1300 hours of paralegal time. He noted the successful result obtained by the plaintiffs, and that "[b]ut for the services of these attorneys, none of these plaintiffs would have recovered any compensation for their property...." He also noted that the attorneys, while relatively inexperienced, had maintained a close relationship with a large number of claimants for more than seven years, had taken 29 depositions, had expended over $130,000 in costs, and had handled two trials, appeals, and numerous writ applications. The court characterized the litigation as "complicated" and "protracted," calling it "a rather novel and difficult controversy for which there was little or no precedent." Finally, the court considered that despite the PPG's constitutional obligation to compensate the plaintiffs, it had "cooperated little" and had "contested vigorously" every step of the litigation, to the point of insisting that the judgment rendered would not be paid without the issuance of a mandamus. In conclusion, the trial court stated:
The Court believes that an award of fees in the amount of 30% of the judgment value in this matter is appropriate. That figure is reasonable when determined on a percentage basis, however, the Court has also arrived at almost the same figure by determining the total hours expended, both attorney and paralegal, multiplying those by a reasonable rate, and then multiplying that figure by *1281 a multiplier commonly used in class action litigation. [footnote omitted]
The hourly rates used by the court were $200 for attorneys and $75 for paralegals, and the multiplier was three. The court noted expert testimony to the effect that the multiplier commonly ranges from three to seven.
Under the circumstances, we do not find that the trial court committed legal error in determining the amount of attorney fees to be awarded, nor do we find the amount to be unreasonable. In support of its argument that the trial court erred by basing the percentage fee on principal and interest, the PPG cites Simmons v. Board of Commissioners, 624 So.2d 935 (La.App. 2d Cir.1993), a case decided under R.S. 13:5111, in which the courts based the amount on principal only. However, in Simmons, the court specifically noted and failed to distinguish a Fourth Circuit inverse condemnation case, Guion v. State Department of Transportation, 391 So.2d 1367 (La.App. 4th Cir.1980), in which this court found the trial court's award of a fee of one third the amount of principal and interest to be justified. 624 So.2d at 956-957. The PPG has cited no binding legal authority which holds that it is improper to base the fee on both principal and interest when the circumstances make it reasonable to do so. In the instant case, the trial court included the interest "as a matter of equity," attributing the accumulated interest to the PPG's unnecessary protraction of the litigation.
In our view, the dual nature of this litigation as a class action also justifies an award that is higher than what would be considered reasonable in a more typical appropriation case. The PPG argues that the trial judge should not have applied a multiplier, as is commonly done in class actions under a lodestar analysis, because the court ordered the defendant to pay the attorney fees directly, rather than having the amount deducted from the fund available to the class. The PPG asserts that plaintiffs cannot have it both ways. This argument is not persuasive. The instant lawsuit has all attributes of a class action that justify an award of attorney fees. Moreover, the fund is not typical, nor is the defendant. The judgment ultimately will not be paid by the PPG; as is provided by law, it will be paid by all the citizens of Plaquemines Parish, including the claimants herein, by means of a tax levied for that purpose, which citizens presumably have already received the benefit of increased flood protection from the levee project. The compensation awarded herein is something to which the plaintiffs are entitled as a matter of law, and we cannot say that the trial court erred by ordering the attorney fees to be paid directly rather than out of the compensation fund.
In a prior expropriation case, this court held that it would not "second guess" the trial court's award of attorney fees in the absence of an abuse of discretion. Coleman v. Chevron Pipe Line Co., 94-1773, 95-0896, 95-0897, p. 12 (La.App. 4 Cir. 4/24/96), 673 So.2d 291, 299. We do not find such an abuse here. We therefore affirm the trial court's award of attorney fees.

AUGUST 16,1999 JUDGMENT ON RULE TO TAX COSTS AND JUNE 15, 2000 JUDGMENT ON SECOND RULE TO TAX COSTS
The trial court assessed against the PPG a total of $117,293.97 in costs associated with the two damage trials ($68,345.89 for the first trial and $48,948.08 for the second trial). These costs included *1282 court filing fees, expert fees, trial exhibit costs, and reasonable expenses of class action litigation. The PPG contends that the amounts awarded are excessive, noting that the trial court excluded only one item claimed by the plaintiffs, namely, $1660.55 in travel expenses.
As in the case of attorney fees, the award of costs is authorized by overlapping statutory and codal provisions: R.S. 13:5112, which provides for the discretionary award of costs in favor of the successful party in a suit against the state or a political subdivision; Code of Civil Procedure article 595, which provides for the award of costs in a class action suit; and Code of Civil Procedure article 1920, which provides generally that costs are paid by the party cast in judgment unless the court, in equity, rules otherwise. Items that may be taxed as costs are governed by R.S. 13:4533, concerning general costs (costs of the clerk and sheriff, witness' fees, costs of taking depositions, copies of acts used at trial, and "all other costs allowed by the court"), and R.S. 13:3666, concerning expert witnesses.
This court has held that, absent an abuse of discretion, it will not interfere with an award of costs. Jacobs v. Loeffelholz, 94-1123, p. 9 (La.App. 4 Cir. 12/15/94), 647 So.2d 1282, 1287. We find no such abuse of discretion in the instant case.
The PPG first contends the trial court erred in awarding $1870.00 in filing fees that the PPG had already paid; however, the record does not support this contention. The PPG next contends that the trial exhibit costs should have been limited to deposition costs only, but this contention is not supported by R.S. 13:4533, which, although it specifically mentions deposition costs, also permits other unspecified costs allowed by the trial court.
The primary argument of the PPG relates to the expert costs awarded. R.S. 13:3666 provides, in pertinent part:
A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of the time employed and the degree of learning or skill required.
B. The court shall determine the amount of fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
(2) By rule to show cause brought by the party in whose favor a judgment is rendered....
Without citing any authority, the PPG argues that under the above-quoted statute, expert witness costs should be limited to the time spent by the expert testifying at trial. Such a limitation is neither present in the statute nor supported by the jurisprudence. A trial court has the discretion to tax as costs expert fees for preparatory, non-testifying expenses. McGee v. Miears, 516 So.2d 1241, 1245 (La.App. 2d Cir.1987). The PPG also argues that the trial court should have excluded expert fees relating to the I-wall claims, which were denied. However, this court has held *1283 that a trial court has discretion to award expert costs even though the party seeking them does not recover all items of damages it seeks. Larkins v. Cage Contractors, Inc., 580 So.2d 1068, 1070 (La.App. 4th Cir.1991).
We note that the bulk of the costs awarded in the instant case are for appraisers.[9] R.S. 13:5111 specifically provides that "reasonable" engineering and appraisal fees actually incurred are compensable in an appropriation proceeding or settlement. The trial court recognized that the certification of this matter as a class action, as well as its complexity and dependence upon expert valuation of massive amounts of property, justified a more liberal award of costs than in an ordinary procedure, stating in its reasons for judgment on the first rule to tax costs:
Having been successful in certifying this matter as a class, and now having been successful in have [sic] a value assessed much higher than then [sic] that suggested by the Defendants, the Plaintiffs are entitled to the costs incurred by them in prevailing in this complicated, monumental, and significant litigation. This is especially so in terms of their expert costs, which was the gravamen of this case.
We find that the costs awarded are reasonable, and therefore that the trial court did not abuse its discretion in this regard.
Plaintiffs contend that the August 16, 1999 Judgment on Rule to Tax Costs inadvertently omits to award legal interest, which is clearly owed on all court costs. See Simmons v. Board of Commissioners, 624 So.2d 935, 959 (La.App. 2d Cir.1993). The PPG does not contest this claim, and we agree that the omission was illegal and apparently an inadvertent error. We therefore amend that judgment to include legal interest from the date of judgment until paid.

CONCLUSION
Accordingly, for the reasons stated, we affirm the August 16, 1999 Judgment as modified by the December 15, 1999 Judgment, except to reduce the amount of damages awarded to Walter Blaize from $12,051.00 to $7,051.00; we amend the August 16, 1999 Judgment on Rule to Tax Costs to include legal interest as provided above and affirm as amended; we affirm the June 15, 2000 Judgment on Class Members' Second Rule to Tax Costs, the June 15, 2000 Judgment on Motion to Fix Interim Statutory Attorneys Fees, and the June 15, 2000 Judgment on Interim Motion to Classify Properties.
AMENDED IN PART; AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] As did the court in Vela II, we refer to those parcels of land from which potions were appropriated as "parent parcels," the appropriated portions of the parent parcels as the "appropriated parcels," and the portions of parent parcels not appropriated as "remainder parcels."
[2] Mr. Blaize was also awarded an additional $5,000 for diminution in value of his marina due to the construction of the I-wall, an issue which is discussed infra.
[3] Plaintiffs admit that Gary and Mallory Mays are not riparian landowners, and thus their property was not included in the appropriating resolutions; the Mays' property, which sustained damage, is alongside a haul road near the levee.
[4] Art. 6, § 42 provides, in pertinent part, "... lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for as provided by law."
[5] The PPG contends that the $48,000 award to Vogt should be reduced by $20,000 (the amount covering lost profits) and that the $10,000 award to Vincent should be reduced by whatever amount (unspecified by the trial judge) is attributable to loss of rent.
[6] We expressly do not reach the issue of whether plaintiffs would be entitled to damages for the I-wall if they had asserted a tort claim based on La. Civil Code articles 667 and 668, because such a claim is not a part of the instant lawsuit.
[7] Vela v. Plaquemines Parish Government, 97-2608 (La.App. 4 Cir. 3/20/99), 729 So.2d 178, writ denied, 747 So.2d 551 (La.9/3/99)
[8] Judgment value was set at $4,929,581.70 through April 30, 2000, plus interest in the amount of $534.90 per day until paid. The trial court designated the judgment as final based upon the PPG's intention to contest on appeal the meaning of the June 3, 1997 judgment, and stipulated that no amount above $1.00 per square foot with interest was to be disbursed to plaintiffs until such time as the judgment became final following appeal.
[9] Appraisal fees accounted for approximately $39,000 of the $45,933.75 in expert expenses awarded for the first trial, and approximately $30,000 of the $42,218.00 expert costs awarded for the second trial.