# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-432
### consolidated with 22-406 and 22-521

**LAFAYETTE CITY-PARISH
CONSOLIDATED GOVERNMENT**

**VERSUS**

**BENDEL PARTNERSHIP (A PARTNERSHIP
IN COMMENDAM), CIRCLE "A" FARM, INC.,
STACY ALBERT FARM, INC., AND
SOUTHERN ACRES, LLC**

\*\*\*\*\*\*\*\*\*\*

## APPEAL FROM THE
## FIFTEENTH JUDICIAL DISTRICT COURT
## PARISH OF LAFAYETTE, NUMBER  C-2021-16273 "B"
## HONORABLE VALERIE GOTCH GARRETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHARON DARVILLE WILSON
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, Billy Howard Ezell, and Sharon Darville Wilson, Judges.

**JUDGMENT VACATED; ORIGINAL JUDGMENT
REINSTATED AND AFFIRMED AS AMENDED;
AND REMANDED.**

**Pride Justin Doran**
**Raven C. Boxie**
**DORAN & CAWTHORNE, PLCC**
**521 East Landry Street**
**Opelousas, Louisiana 70570**
**(337) 948-8008**
**Counsel for Defendant/Appellee/Cross-Appellant:**
   **Bendel Partnership, A Partnership in Commendam**

**Sarah Harbison**
**PELICAN INSTITUTE OF PUBLIC POLICY**
**400 Poydras Street, Suite 900**
**New Orleans, Louisiana 70130**
**(504) 952-8016**
**Counsel for Amicus Curiae:**
   **Institute for Justice**

**Christen Hebert**
**INSTITUTE FOR JUSTICE**
**816 Congress Avenue, Suite 960**
**Austin, Texas 78701**
**(512) 480-3936**
**Counsel for Amicus Curiae:**
   **Institute for Justice**

**Michael D. Hebert**
**BECKER & HEBERT, LLC**
**201 Rue Beauregard**
**Lafayette, Louisiana 70508**
**(337) 233-1987**
**Counsel for Plaintiff/Appellant/Cross-Appellee:**
   **Lafayette City-Parish Consolidated Government**

**Gregory J. Logan**
**Lafayette City-Parish Attorney**
**THE LOGAN LAW FIRM**
**700 Jefferson Street**
**Lafayette, Louisiana 70505**
**(337) 406-9685**
**Counsel for Plaintiff/Appellant/Cross-Appellee:**
   **Lafayette City-Parish Consolidated Government**

**Camille Bienvenu Poche'**
**Karen T. Bordelon**
**BABINEAUX, POCHÉ, ANTHONY & SLAVICH, LLC**
**Post Office Box 52169**
**Lafayette, Louisiana 70505-2169**
**(337) 984-2505**
**Counsel for Plaintiff/Appellant/Cross-Appellee:**

Lafayette City-Parish Consolidated Government

Randall A. Smith
L. Tiffany Hawkins
SMITH & FAWER, LLC
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana  70170
(504) 525-2200
Counsel for Defendant/Appellee/Cross-Appellant:
    Bendel Partnership (A Partnership in Commendam)

Omar J. Thibeaux
THE THIBEAUX FIRM
400 E. Kaliste Saloom Road, Suite 3200
Lafayette, Louisiana  70508
(337) 453-4663
Counsel for Plaintiff/Appellant/Cross-Appellee:
    Lafayette City-Parish Consolidated Government

**WILSON, Judge.**

In this expropriation proceeding, both the landowner, Bendel Partnership, A Partnership in Commendam (Bendel), and expropriating authority, the Lafayette City-Parish Consolidated Government (LCG), appeal multiple rulings from the trial court, which dismissed the expropriation petition, reserved the landowner's claims for attorney's fees and damages, and omitted an award of costs to the landowner. For the reasons that follow, we find no manifest error in the trial court's granting the motion to dismiss. However, we vacate the trial court's May 26, 2022 judgment and reinstate the May 4, 2022 judgment and amend it to include the following language: "Bendel Partnership's rights regarding any claims for attorney's fees and/or damages are hereby reserved." The matter is remanded for further proceedings consistent with this opinion.

## I.

## ISSUES

LCG argues that the trial court erred in granting Bendel's motion for partial new trial, in rendering an amended judgment, and in issuing supplemental reasons for ruling without conducting the requisite contradictory hearing on Bendel's purported right to a partial new trial and without specifying its reasons for granting the motion. LCG also argues that the trial court erred in failing to limit its review to the question of whether LCG acted arbitrarily, capriciously, or in bad faith and in applying an elevated standard of care to LCG's determination of public necessity. In the alternative, LCG asserts that the trial court's findings of fact in holding that LCG acted arbitrarily, capriciously, or in bad faith are manifestly erroneous.

Bendel asserts that the trial court erred in failing to either grant or reserve its claims for damages and attorney's fees in its May 4, 2022 judgment; in omitting an award of costs in its May 26, 2022 judgment; and in finding that LCG was required to meet its burden of proving an abuse of discretion by clear and convincing evidence.

## II.

## FACTS AND PROCEDURAL HISTORY

On December 6, 2021, pursuant to La.R.S. 19:139, *et seq.*, LCG filed a petition for expropriation against Bendel. Bendel is the owner of approximately 372.21 acres of immovable property located in Section 82, Township 10 South, Range 4 East and Sections 5, 38, 39 and 42, Township 11 South, Range 4 East in Lafayette Parish, Louisiana (the Bendel Property).[1] LCG sought to expropriate the Bendel Property for the construction of four (4) detention ponds, known as the Homewood Drive Detention Pond Project (the Homewood Project),[2] for the stated purpose of "the improvement of drainage, as well as protection and public safety from flooding in Lafayette Parish, Louisiana." LCG had made a formal offer to purchase the Bendel Property for $2,580,000.00 on September 17, 2020.

The following documents were attached to the petition: (1) the legal description of the Bendel Property; (2) a certified copy of the ordinance declaring that Homewood Project was a public necessity and authorizing expropriation of property for that purpose; (3) a certificate signed by Pamela Gonzales Granger (Granger), the supervising engineer, declaring that she had "fixed the right-of-way

---

[1] The Bendel Property was being actively farmed pursuant to a sugar cane farm lease to Circle "A" Farm, Inc., that was effective from February 1, 2019, through January 31, 2023.

[2] The Project was declared a public necessity by the Lafayette City Council and the Lafayette Parish Council under Joint Ordinance No. JO-012-2021 on March 23, 2021.

for the Project in a manner sufficient in my judgment to provide for the public interest, safety, and convenience, and further, location and design of the Project are in accordance with the best modern practices adopted in the interest of safety and convenience of the public[;]" (4) an itemized statement of loss/damage by an appraiser that estimated just compensation at $2,580,000.00; (5) a letter to Bendel notifying it of the intent to expropriate the Bendel Property and return receipts of delivery; and (6) a memo from Granger that outlined the due diligence modeling and evaluation (the McBade memo).

On December 7, 2021, the district court signed an order declaring the Bendel Property taken for the Homewood Project. Pursuant to the order, LCG deposited $2,580,000.00 in to the registry of the court on December 8, 2021. On December 14, 2021, Bendel filed an ex parte motion seeking to withdraw the funds from the registry of the court. LCG would later file an opposition to that motion.

Then, on December 23, 2021, pursuant to La.R.S. 19:139.5, Bendel filed a motion to dismiss the expropriation petition. The motion to dismiss alleged that: (1) the Bendel Property was not being taken for a valid public use; (2) more property was expropriated than was needed for the Homewood Project; and (3) Bendel was entitled to attorney's fees, costs, and damages for the period during which LCG possessed the Bendel Property. The hearing on the motion to dismiss began on March 17, 2022. On March 18, 2022, Bendel moved for a continuance of the hearing. LCG opposed the continuance.

On March 23, 2022, the trial court signed an order that: (1) continued the hearing to April 6, 2022; (2) enjoined all work on the Bendel Property until 5:00 p.m. on April 6, 2022; and (3) authorized Bendel to withdraw $500,000.00

3

(representing a portion of the $2,580,000.00 deposited by LCG) from the registry of the court.

At the conclusion of the hearing on April 6, 2022, the trial court took the matter under advisement. On May 4, 2022, the trial court issued written reasons and signed a judgment dismissing the petition for expropriation and ordering that all work cease immediately. The trial court cast LCG with all costs.

On May 13, 2022, Bendel filed a motion for partial new trial, seeking that the trial court modify its judgment to provide for the reservation of its claims for attorney's fees and damages. Without a hearing, the trial court issued an amended judgment on May 26, 2022. This judgment dismissed the petition for expropriation but "expressly reserve[d] Defendant's rights regarding any claims for attorney's fees and damages" and provided the trial court would "entertain any motions regarding the same." Then, on May 31, 2022, the trial court issued supplemental written reasons for ruling, which explained its reference, in its original written reasons for judgment, to a deposition that was not introduced into evidence.

Additionally, on May 31, 2022, the trial court issued an order stating that no rule to show cause was necessary on Bendel's motion for partial new trial. On June 2, the trial court marked "DENIED" across the rule to show cause submitted by Bendel with its motion for partial new trial and referenced "SEE ALTERNATE ORDER[.]" It is unclear whether this reference is to the May 26, 2022 amended judgment or the May 31, 2022 order.

LCG sought writs on the trial court's granting of Bendel's motion for partial new trial. LCG also filed a devolutive appeal of the May 4 and May 22, 2022 final

4

judgment and related interlocutory orders. Bendel filed a devolutive appeal with respect to the May 4, May 26, May 31, and June 1, 2022 judgments.

On July 25, 2002, this court issued a ruling granting LCG's writ application for the limited purpose of ordering the consolidation of the writ application with LCG's pending appeal. *Lafayette City-Par. Consol. Gov't v. Bendel P'ship*, 22-406 (La.App. 3 Cir. 7/25/22) (unpublished writ decision). Bendel's appeal was consolidated with LCG's appeal and writ application by order of this court signed on September 1, 2022. The Institute of Justice (IJ) filed an amicus curiae brief in support of Bendel.

### III.

### STANDARD OF REVIEW

"Whether the expropriator's purpose is public and necessary is a judicial determination that will not be reversed on appeal absent manifest error. In the context of expropriation, 'necessary' refers to the necessity of the purpose for the expropriation not the necessity for a specific location." *ExxonMobil Pipeline Co. v. Union Pac. R.R. Co.*, 09-1629, p. 12 (La. 3/16/10), 35 So.3d 192, 200 (citations omitted). "[T]he *extent* and *location* of the property to be expropriated are within the sound discretion of the body possessing the power of eminent domain, and those determinations will not be interfered with by the courts if made in good faith." *Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot*, 628 So.2d 75, 78 (La.App. 3 Cir. 1993), *writ denied*, 94-168 (La. 3/18/94), 634 So.2d 854 (emphasis in original). A trial court's finding that the expropriating authority acted in bad faith or arbitrarily and capriciously is subject to the manifest error standard of review. *State, Dept. of Transp. & Dev. v. Est. of Griffin*, 95-1464 (La.App. 1 Cir. 2/23/96), 669 So.2d 566.

5

LCG argues, however, that it is entitled to a de novo review of the record, alleging that the trial court's judgment is premised upon an incorrect legal standard. LCG argues that the trial court placed the burden of proof on LCG to show that it acted in good faith rather than on Bendel to show that LCG acted in bad faith. "Placing the burden of proof on the wrong party is a legal error that interdicts the fact-finding process because it casts a more onerous standard than the law requires on one of the parties." *Breaux v. Pickett*, 22-19, p. 2 (La.App. 3 Cir. 5/25/22), 340 So.3d 196, 198, *writ denied*, 22-985 (La. 10/12/22), ___ So.3d ___. As explained below, we find no legal error by the trial court, and our review is subject to the manifest error standard of review.

## IV.

## LAW AND DISCUSSION

*Motion to Dismiss Expropriation Petition*

As this court recently recognized in *Lafayette City-Parish Consolidated Government v. Lucile B. Randol Heirs, LLC*, 21-778, pp. 6-7 (La.App. 3 Cir. 8/3/22), ___ So.3d ___, ___, *writ denied*, 22-1533 (La. 12/6/22), ___ So.3d ___:

> [P]rivate property is subject to expropriation by a public entity when it is needed "for public purposes" and when just compensation is paid to the owner. La.Const. art. 1, § 4(B)(1). A drainage project intended for the "benefit of the public generally[,] counts as a "public purpose" pursuant to La.Const. art. 1, § 4(B)(2)(iii).
>
> The right of the LCG to expropriate private property for drainage purposes by a declaration of taking is set forth in Part III-I of Title 19 of the Louisiana Revised Statutes.

"[T]he expropriating agency must show by a preponderance of the evidence a public need or interest in the expropriation." *Recreation & Park Comm'n for Par. of E. Baton Rouge v. C&S Dev., Inc.*, 97-2652, p. 3 (La. 7/8/98), 714 So.2d 706, 707 (footnote omitted). When this burden is met, "the burden shifts to the

6

defendant to show that the agency has abused its discretion in selecting the site to be expropriated." *Id.*

In *Lucile B. Randol Heirs*, ___ So.3d at ___, we quoted the following language from *Calcasieu-Cameron Hosp. Serv. Dist.*, 628 So.2d at 79:

> Criteria to be considered by the expropriator include the availability of an alternate route, costs, environmental factors, long-range area planning, and safety considerations. The expropriating agency may abuse its discretion by acting without considering and weighing the relevant factors, that is, by acting arbitrarily. *Red River Waterway Comm'n. v. Fredericks,* 566 So.2d 79 (La.1990), and authorities cited therein. However, the mere availability of a feasible alternative location is not, by itself, an indication that the expropriator has acted arbitrarily or capriciously in making its selection. *Faustina Pipe Line Co. v. Levert–St. John, Inc.,* 463 So.2d 964 at 969 (La.App. 3d Cir.), *writ denied*, 466 So.2d 1301 (La.1985), quoting *Louisiana Resources Co. v. Stream,* 351 So.2d 517 (La.App. 3d Cir.1977).

We also noted that the "seminal case on quick taking" is *Red River Waterway Commission*, 566 So.2d 79. *Lucile B. Randol Heirs*, ___ So.3d at ___. "[T]he party contesting the expropriation must prove by clear and convincing evidence that the expropriating authority, 'in selecting the location and extent of the property to be expropriated, acted in bad faith or so capriciously or arbitrarily that its action was without an adequate determining principle or was unreasoned.'" *Lucile B. Randol Heirs*, ___ So.3d at ___, *quoting Red River Waterway Comm'n*, 556 So.2d at 83. Moreover, the expropriating authority benefits from a presumption that its chosen location is the "best and most feasible[]" location for the project. *Acadian Gas Pipeline Sys. v. Nunley*, 46,648, p. 10 (La.App. 2 Cir. 11/2/11), 77 So.3d 457, 463, *writ denied*, 11-2680 (La. 2/10/12), 80 So.3d 487.

This court also found that "'best modern practices' as it pertains to drainage projects, means that an engineer should utilize the best engineering practices and experiences in locating and constructing the drainage project, in accordance with

the engineer professional's acceptable minimum standard of care." *Lucile B. Randol Heirs*, ___ So.3d at ___. The trial court found that LCG failed to comply with the procedural requirements of La.R.S. 19:139.1(3)(b) such that its actions were arbitrary and capricious. This court found that a de novo review of the record was necessitated by the trial court's misinterpretation of the term "best modern practices" and reversed the trial court's grant of the landowner's motion to dismiss. Such is not the case here, and this opinion should not be read as a disagreement with our learned colleagues in *Lucile B. Randol Heirs*, ___ So.3d ___.

In this case, the trial court made a finding of fact that LCG met its burden of proving that there was valid public purpose based on the evidence that millions of dollars in FEMA claims were filed in Louisiana as a result of the August 2016 flood, that Lafayette Parish's current infrastructure is built only for five-year storms, and that the Homewood Project would alleviate flooding throughout Lafayette Parish. The trial court also noted that Bendel produced no evidence to suggest that flood reduction and drainage improvement would not affect the public. That portion of the trial court's ruling is not at issue in either LCG's or Bendel's appeal. Thus, the question is whether LCG acted arbitrarily, capriciously, or in bad faith in determining the necessity of the taking of this particular property. Despite Bendel's assertion to the contrary, the case law is clear that the landowner bears the burden of proof on this point by clear and convincing evidence. *See State, Through Dept. of Highways v. Jeanerette Lumber & Shingle Co., Ltd.,* 350 So.2d 847 (La.1977), *Red River Waterway Comm'n*, 566 So.2d 79, and *Lucile B. Randol Heirs*, ___ So.3d at ___.

In its May 4, 2022 written reasons for ruling, the trial court noted its "particular concern" that the LCG expropriation of the Bendel Property lacked

objective analysis and peer review in that no engineering reports were submitted in

connection with the Homewood Project. The trial court then stated that:

> While LCG undoubtedly conducted some analysis, data collection, and modeling regarding the Homewood Detention Project, the Court finds that LCG fell short of an adequate determining principle and/or that the decision to expropriate this particular [site] was arbitrarily determined.
>
> . . . .
>
> LCG further states that it selected the Bendel [P]roperty because of its location at the confluence of two major drainage channels, namely the Vermilion River and the Coulee Ile de Cannes. Perhaps because of this location, LCG then conducted further studies of the effectiveness of the detention project *only* on the Bendel [P]roperty, ignoring other possible locations, even those that were close in proximity and thus also ideally situated near those channels. Specifically, Dr. [Emad] Habib's study considers only the Homewood Detention Project that is the subject of the current location, the adjustment of spoil banks inside the Bayou Tortue Swamp, and the construction of two detention ponds on the main tributaries of Coulee Ile de Cannes. Further modeling performed by LCG analyze only the Homewood Detention Project. None of these studies consider other possible locations for the detention ponds to the extent that the Bendel Property is considered, which suggests to this Court that LCG decided first that it would expropriate the Bendel Property and then conducted studies to support the decision. Unfortunately for LCG, those after-the-fact studies do not sufficiently justify expropriation either.
>
> . . . .
>
> Had LCG adequately considered other properties, it may have realized that the property adjacent to the Bendel Property is similarly situated near both the Vermilion River and the Coulee Ile de Cannes and, unlike, the Bendel Property, has a lower elevation that would be less costly to excavate.
>
> Additionally, though LCG characterizes the Bendel [P]roperty as "vacant," the fact remains that LCG has expropriated over 370 acres that has historically been used for agriculture, in addition to pipelines and well, all important aspects of the local economy. Although LCG has deposited the appraised value of the land in the registry of the court, there does not appear to be any accounting of the cost of interfering with existing farm leases and preventing future farming on this large piece of property.

Further, LCG by its own admission only intends to use a total of 90 acres for 4 detention ponds in addition to more land to be used for a "staging area." The staging area is only needed for the construction of the detention ponds, and no evidence has been presented as to the purpose of expropriating the remaining 200+ acres of the Bendel [P]roperty. Additionally, the detention ponds and staging area are situated in a way that the Court finds unnecessarily extends across the depth of the Bendel Property despite the availability of the length of the Bendel Property for such ponds and staging area. The Court therefore finds that LCG acted without reason and adequate determining principles with respect to the extent of the property expropriated.

(Emphasis in original.) (Footnotes omitted.)

LCG argues that although the trial court correctly stated the burden of proof, the trial court incorrectly placed the burden on LCG to show that its actions were not arbitrary and capricious. In reviewing the trial court's detailed reasons for ruling, we cannot agree with LCG's position. We find, as did the trial court, that LCG did not consider the criteria set forth in *Red River Waterway Commission*, 566 So.2d 79.

According to LCG, it had examined the prospect of constructing detention ponds on the Bendel Property for two years prior to the expropriation, and its own in-house civil engineer and Floodplain Administrator, Jessica Cornay (Cornay), had identified the Bendel Property and conducted the first hydraulic modeling of detention ponds, which confirmed her hypothesis that the Bendel Property was a suitable site.

Cornay testified that she used a heat map of the FEMA claims from the August 2016 flood to identify clusters of claims. Then she began marking locations that would benefit from detention ponds. She narrowed down locations by considering which sites were close to the banks of a channel, sites that would help the largest number of people, and vacant property. The sites were then

10

separated by size and some feasibility review was done. The Bendel Property was number forty-seven on the list, but this does not mean that it was the forty-seventh property considered by LCG. Cornay testified that it was "pretty obvious" that the Bendel Property was an area worth looking into "just from an aerial view" because it is on the banks of the Vermilion River and is a sizeable tract near the heart of Lafayette. Cornay testified that she did not go to the site. Cornay testified that the modeling for the Homewood Project showed a five-inch reduction on the Vermilion River and impacts of twenty-five miles long. Cornay testified that at the time the property was expropriated, there had been no soil assessments.

LCG argues that this court already confirmed that this vetting process was "not one that was undertaken in haste or without considering and weighing all of the relevant factors" in *Lucile B. Randol Heirs*, ____ So.3d at ___. In that case, however, the testimony was that sites were vetted through hydraulic studies and that once LCG identified potential locations, information was provided to "Southeast Engineers, who performed hydraulic studies to determine the effect the proposed detention ponds would have on the water surface elevation in the adjacent channels during 10 and 50-year storms[,]" and "that of the ninety sites identified, approximately twenty-two have proven potentially beneficial in reducing flooding in the areas identified." *Lucile B. Randol Heirs*, ____ So.3d at ___. Further, LCG specifically considered two of the ninety sites and determined that one was better than the other due to its significantly lower elevation and the fact that the other had baseball fields that would require a significant cost to relocate. The property was 16.054 acres. That was not the testimony in this case. To the contrary, only the Bendel Property was modeled in this case.

11

Dr. Emad Habib (Dr. Habib), a professor in the Department of Civil Engineering and the Louisiana Watershed Flood Center at the University of Louisiana at Lafayette, conducted a study commissioned by LCG and produced a report entitled "Feasibility Assessment of Flood Mitigation measures in Vermilion River Watershed," dated April 2021.[3] Dr. Habib was not deposed and did not testify at trial, but the parties stipulated to the admission of his report into evidence. Dr. Habib's report states that it "provides the results of modeling-based assessment of different alternatives that are proposed for reducing flood risk within the Vermilion Watershed." The Watershed Flood Center had previously developed a hydraulic model for the Vermilion River basin, and this new study utilized the existing model to "evaluate the potential benefits and any possible consequences of the proposed modifications including the readjusting of the heights of the spoil banks separating the Vermilion River and the Bayou Tortue swamp, constructing the Homewood pond, and building the two proposed detention[] ponds on the Coulee Ile de Cannes." The report states that "[t]he Homewood detention pond scenario aims to reduce the maximum water stages inside the Vermilion [R]iver through storing some of the flood waters in the pond." In its consideration of the Homewood pond, the report references "a farmland of about 375 acres" across the outlet of Coulee Ile de Cannes to the east and noted that about 5.28 million cubic yards of excavation work would be needed. The study concluded that "[t]he Homewood detention pond reduced the maximum water stage in the Vermilion River by an average of 0.22 ft and 0.51 ft during the May-2014 and August-2016

---

[3] LCG notes that Dr. Habib's report was issued after the adoption of the public necessity ordinance but alleges that the results of his study were made known to LCG prior to the adoption of the public necessity ordinance.

storms, respectively." The report also noted that factors such as "**cost and constructability**" had to be considered in determining "the most optimal and cost-effective alternative[,]" whereas it "**mainly focused on the capacity of each scenario in reducing the flood elevation in comparison to the existing condition** (baseline) under two different storm events[.]" (Emphasis added.)

Granger[4] testified that she was retained to perform modeling as part of the ninety-day due diligence period after the adoption of the public necessity ordinance. Granger admitted at trial that she did not select the location of the Homewood Project, she did not select the Bendel Property, and she did not have any role in the LCG's determination of necessity. In the McBade Memo, Granger noted that the preliminary planning model "did not evaluate the 10-year, 50-year and 100-year 24-hour design storm events using the Louisiana Rainfall Depth for National Resource Conservation Service (NRCS) method of 7.8 inches, 11.1 inches and 12.6 inches respectively, commonly used to evaluate projects at the design level"

---

[4] Bendel alleged that Granger had a conflict of interest that precluded her from testifying because she had a financial interest in the outcome of the case. Specifically, Bendel pointed to the contract between Granger's firm and LCG, which provided payment for hourly work, a lump sum payment for the engineering report, and a percentage of the construction costs that would be paid only if the project was completed. The hearing on the motion to dismiss was recessed so that Granger could seek an advisory opinion from the Louisiana Professional Engineering and Land Surveying Board (LAPELS). LAPELS found that there was no conflict of interest, and the hearing resumed on April 6, 2022.

IJ's amicus curiae brief argues that Granger's financial stake in the Homewood Project violates the United States and Louisiana Constitutions, which guarantee that the government will not deprive a person of life, liberty, or property without due process. LCG opposed the filing of a brief by IJ and alleged that IJ had no specific interest in this case and that the issue of due process had not been raised by the parties or considered by the trial court. This court allowed IJ's brief to be filed; however, we do not consider the constitutional issue since it was not raised in the trial court. *Johnson v. Welsh*, 334 So.2d 395 (La.1976). Further, the trier of fact determines how much weight to give expert testimony "based on the professional qualifications and experience of the expert, the facts and studies upon which his opinion is based, his familiarity with the locality of the property involved, and the possible bias of the witness in favor of the side for whom he testifies." *W. Jefferson Levee Dist. v. Coast Quality Const. Corp.*, 93-1718, p. 23 (La. 5/23/94), 640 So.2d 1258, 1277, *cert. denied*, *Bayou Des Familles Dev. Corp. v. W. Jefferson Levee Dist.*, 513 U.S. 1083, 115 S.Ct. 736 (1995).

and "did not evaluate localized benefits of the project." Granger also noted that a new HEC-RAS model needed to be created because of the "many inconsistencies in modeling events, scenarios and outdated geometry." So, it is clear that Granger had some reservations about the modeling done by Cornay and that Granger looked only at the Bendel Property. Granger estimated that the construction costs for the Homewood Project would be about $45 million.

Granger testified that in the layout and design of the detention ponds, there would be a two hundred and fifty to three hundred feet buffer from the Vermilion River to the top banks of the ponds to prevent any issue associated with any erosion that could potentially happen. Granger also testified that there was room around each pond for maintenance and sufficient staging room. Granger said that she had no issues with the suitability of the soil.

While Granger and Cornay reviewed Dr. Habib's report, they were not able to use his model. When asked if she had considered other potential locations for the Homewood Project, Granger responded that "[w]e looked at other locations for Coulee Ile de Cannes and also other locations. We did look at some adjacent property locations, but none of them would result in large enough area due to pipelines and other utilities, but we did look at several with regards to Coulee Ile de Cannes and what are the different alternatives." Granger stated her opinion that to impact the entire parish, the Homewood Project, Coulee Ile de Cannes, and Coulee Granges and Chappuis would all have to be constructed.

The trial court discounted Granger's testimony based on its finding that her "financial stake in the project creates a risk for biased or subjective models or interpretation of the data produced by the model."

LCG's corporate representative, Chad Nepveaux (Nepveaux), a Public Works Director, testified: "I cannot personally point out any specific alternate sites. For me, alternate project sites where we are doing similar projects that are going to work in conjunction with this particular project due to location, finding a comparable alternative, it's very difficult. Near impossible." It was his opinion that there are no alternate sites. In the 1442 deposition of LCG, Nepveaux was asked: "What has LCG done to determine the safety of the project with the gas line running through the property?" He responded: "At this point, I'm not aware of any specific action taken." Nepveaux was also unaware of any studies that had been done to ensure that the ponds do not wind up being incorporated into the river through erosion or because of failure of the tops of the ponds.

Bendel retained the services of Toby Fruge (Fruge), who was qualified as an expert in civil engineering with a specialty in storm drainage. Fruge did not conduct any hydraulic modeling of his own. Fruge's opinion was that the models created were based on outdated information. Fruge also testified that it was his opinion that the McBade Memo ran afoul of standard engineering practice and that it appeared to justify the ordinance "on the back end" because it only looked at the project that the ordinance addresses without consideration of any alternative sites. Fruge stated: "It does appear to me that the model[]ing was done to support that project, not to look at what is the best possible solution, the most cost-effective approach to solve flooding on the Vermilion river or in the area in general."

Fruge's testimony indicated that there "might" be better sites for the Homewood Project:

> I did look at LiDAR, and there is a site immediately adjacent to this one, has lower elevation, that [] could be a potentially [] better site. It's just it was never investigated by anybody. . . . [I]t's my opinion

15

that there are lower sites in Lafayette Parish that are more viable for a pond just based upon elevation, location, and . . . the model[]ing. . . There's a possibility that the model[]ing could back it up.

In his testimony, Fruge stated that he had "no idea" how LCG chose the Bendel Property. Fruge also testified that he had never seen a case where a property that has never flooded was converted to purposely make it flood because usually lower elevated property would be used so that so much excavation would not be necessary.

Fruge's opinion was that there was no comprehensive drainage plan or model to show what was causing the flood risk and what the ultimate benefit of the different recommendations (i.e., stream improvements, channel improvements, detention ponds, and combinations thereof) would be. Fruge opined that a comprehensive model was necessary to help make a determination of which properties to use. Fruge also noted that the amount of soil that needed to be removed from the Bendel Property, as noted by Dr. Habib's report, was 528,000 loads of dump truck dirt, which was enough to fill up the Superdome three and a half times. Fruge noted that this would increase the cost of the project and could impact the existing infrastructure. According to Fruge, a soil report done by McDowell indicated that the excavated dirt would be unusable since it was "muck." The soil report was not done until after the property was expropriated.

Fruge also testified that he had never seen a justification for Granger's cost estimate. He was not aware of any line item cost estimate for this project. Granger's estimate did not include any additional costs related to the soil analysis. It was Fruge's opinion that prior to taking the property, there was no sufficient cost versus benefit analysis of the project.

The court found the assumptions on which the design was based were "more likely than not . . . incorrect." The court also was not impressed by plaintiff's indifference to the potentially incorrect information after being put on notice it might be incorrect.

Even though the expropriating authority has wide discretion in determining the necessity and extent of a taking, this discretion is not unbridled. Our supreme court has stated "the expropriating authority should be in a position to justify and support with cogent reasons" the taking for an appropriate purpose. *Jeanerette Lumber*, 350 So.2d at 855.

The weight to be given to the testimony of experts is largely dependent upon the facts upon which their opinions are based. *Quinones v. United States Fid. & Guar. Co.*, 93–1648 (La. 1/14/94), 630 So.2d 1303, 1308. Neither of plaintiff's design engineers could justify the data, particularly traffic count and hydraulic evaluation used in selecting the design for this bridge. They could not identify the source of their data, much less testify as to its accuracy. No one who could do so testified. Had they been able to do so, this may have been a case of manifest error. Plaintiff's witnesses admitted if defendants' information more accurately reflected the actual site data, a smaller bridge design might be acceptable according to AASHTO guidelines which could be built within the existing right of way. The trial court was not manifestly erroneous in finding plaintiff acted arbitrarily and capriciously.

*Est. of Griffin*, 669 So.2d at 570. Further, in *Acadian Gas Pipeline Sys. v. McMickens*, 18-337, p. 26 (La.App. 3 Cir. 12/28/18), 263 So.3d 524, 540, this court found that the expropriating party acted arbitrarily, capriciously, and in bad faith where "much of the testimony . . . was self-serving in that their exploration of actual alternative rouses was just a farce[.]"

LCG further argues that the trial court imposed a standard of scientific certainty upon LCG and substituted its judgment for that of LCG, its elected officials, and its engineers. LCG points to this court's finding in *Calcasieu-Cameron Hosp. Serv. Dist.*, 628 So.2d 75, that the landowner did not carry its burden of proving that the expropriator was in bad faith where there was no formal plan for the expansion of the hospital that necessitated the taking, no design

17

consultant had been engaged, and no funding had been secured for the improvements contemplated for the expropriated property. This court found that "the trial judge impermissibly substituted his own judgment for that of the Hospital District in determining that the expropriation was not necessary because there are alternative locations available for parking." *Id*. at 80.

In *Calcasieu-Cameron Hosp. Serv. Dist.*, 628 So.2d 75, however, and distinguishing it from the case sub judice, there was testimony that the property was necessary for the expansion of the hospital's power plant since there was no other property next to the existing power plant; that the property taken was, in fact, next to the existing power plant; that it was more economical to expropriate the subject property than to relocate the power plant; and that the property was needed to replace parking spots that would be lost due the expansion.

In this case, the testimony and evidence make clear that no alternate routes were considered. The total cost of the project is unknown. Environmental factors and long range area planning were not considered. None of the witnesses testifying on behalf of LCG indicated that safety considerations were made regarding the gas line that runs through the property. Based on all of these factors, we cannot say that the trial court was manifestly erroneous in finding that LCG acted arbitrarily and capriciously. That finding is affirmed.

*Attorney's Fees, Damages, and Costs*

In its motion to dismiss the expropriation proceedings, Bendel requested that the trial court "dismiss LCG's Petition, order the return of the Property, and award the landowner its attorney's fees, costs, and any other damages that the Landowner may have incurred as a result of the unlawful taking." The May 4, 2022 judgment cast LCG with costs but made no mention of attorney's fees or damages. Bendel

18

filed a motion for partial new trial, alleging that Louisiana law mandated awards of attorney's fees, costs, and damages in cases of wrongful expropriation. Bendel cites La.R.S 19:201(A), which provides:

> A court of Louisiana having jurisdiction of a proceeding instituted by any expropriating authority referred to in R.S. 19:2 shall award the owner of any right, or title to, or interest in the property sought to be expropriated such sum as will, in the opinion of the court, reimburse such owner for his reasonable attorney fees, and court costs, actually incurred because of the expropriation proceeding, if the final judgment is that the plaintiff does not acquire at least fifty percent of the immovable property requested in the petition for expropriation or if the proceeding is abandoned by the plaintiff. If the expropriating authority is the state or its political corporations or subdivisions, any such award shall be paid from the same funds from which the purchase price of the property would have been paid.

Without holding a contradictory hearing, the trial court signed an amended judgment on May 26, 2022, which stated that "this Court expressly reserves Defendant's rights regarding any claims for attorneys' fees and damages and will entertain any motions regarding same." On June 2, 2022, the trial court stamped "DENIED" across the face of the rule to show cause submitted with Bendel's motion for partial new trial.

"The trial court may deny a motion for new trial ex parte without a contradictory hearing." *Samuel v. Harris*, 21-1577, p. 3 (La.App. 1 Cir. 6/3/22), 342 So.3d 1009, 1011. "The trial court's discretion in ruling on a motion for new trial is great, and its decision will not be disturbed on appeal absent an abuse of that discretion." *Id*. In this case, however, even though the trial court denied Bendel's motion for partial new trial, it issued an amended judgment that granted the relief sought therein. Louisiana Code of Civil Procedure Article 1971 provides, in part, that "[a] new trial may be granted, upon contradictory motion of any party or by the court on its own motion, to all or any of the parties and on all or part of

19

the issues, or for reargument only." "When a new trial is granted, it shall be assigned for hearing in accordance with the rules and practice of the court." La.Code Civ.P. art. 1977. "[T]he trial court, having granted a new trial, erred in rendering a judgment contrary to the first judgment without assigning the case for hearing or argument as required by LSA-C.C.P. art. 1977." *DiVincenti v. First Guar. Bank*, 481 So.2d 712, 714 (La.1985).

On appeal, LCG argues that the trial court's May 26, 2022 judgment is absolutely null because it made a substantive alteration rather than merely a change to alter the phraseology or to correct deficiencies in the decretal language as allowed by La.Code Civ.P. art. 1951. LCG further argues that by not setting the motion for partial new trial for hearing, the trial court "foreclosed any possibility of thereafter awarding Bendel the relief requested." LCG asserts that Bendel specifically asserted its claims for attorney's fees and damages prior to the trial on its motion to dismiss and that the May 4, 2022 judgment's failure to award any amounts for attorney's fees or damages is a rejection of those claims as a matter of law.[5] LCG argues in brief that Bendel did not reserve its rights to claim attorney's fees, damages, and costs, but merely reserved its rights to have those claims quantified.

Bendel, in its own appeal, argues that if the May 26, 2022 judgment is null, then the trial court erred in failing to reserve its rights to attorney's fees and damages in the May 4, 2022 judgment. Bendel asks that this court amend the May 4, 2022 judgment to include a reservation of its right to seek attorney's fees and

---

[5] "[I]t is well settled that when a trial court's judgment is silent with respect to a party's claim or an issue placed before the court, it is presumed that the trial court denied the relief sought." *Moore v. Moore*, 12-959, p. 4 (La.App. 3 Cir. 4/10/13), 116 So.3d 18, 22, *writ denied*, 13-1065 (La. 6/21/3), 118 So.3d 421.

damages. Bendel argues that these matters were not placed before the court in its motion to dismiss because they were premature until it was successful in having the expropriation dismissed. Neither party presented any argument or evidence regarding the merits of Bendel's claims for attorney's fees and damages. Bendel also asserts, in its own appeal, that if the May 26, 2022 judgment is upheld by this court, that this court should amend the May 26, 2022 judgment to include an award of costs.

We find that the trial court's May 26, 2022 judgment is absolutely null pursuant to La.Code Civ.P. art. 1951. "Substantive amendments to judgments made without recourse to the proper procedures, *i.e.*, by way of a timely motion for a new trial or by appeal, are absolute nullities." *Suprun v. La. Farm Bureau Mut. Ins. Co.*, 09-1555, pp. 12-13 (La.App. 1 Cir. 4/30/10), 40 So.3d 261, 269. "This is true even if the amendment merely expresses the trial court's actual intention[.]" *Locke v. Madcon Crop.*, 21-382, p. 4 (La.App. 1 Cir. 12/30/21), 340 So.3d 946, 949. "The usual remedy applied by an appellate court when it finds an amendment of substance has been made in a judgment is to annul and set aside the amending judgment and reinstate the original judgment." *Suprun*, 40 So.3d at 270.

In *Vela v. Plaquemines Par. Gov't*, 00-2221, p. 31 (La.App. 4 Cir. 3/13/02), 811 So.2d 1263, 1283, *writ denied*, *Crutchfield v. Plaquemines Par. Gov't*, 02-1350 (La. 6/21/02), 819 So.2d 337, and *writ denied*, *Crutchfield v. Plaquemines Par. Gov't*, 02-1224 (La. 6/21/02), 819 So.2d 343, the appellate court amended a trial court's judgment on a rule to tax costs that "inadvertently" omitted an award of legal interest that was "clearly owed on all court costs." This court has held that "[b]y its clear and unambiguous terms, La.R.S. 19:201 is a mandatory provision insofar as it states that a court having jurisdiction over an expropriation proceeding

'**shall**' award attorney's fees when expropriation proceedings are dismissed or abandoned." *Town of Jonesville v. Griffing*, 95-1365, p. 3 (La.App. 3 Cir. 3/6/96), 670 So.2d 737, 739, *writ denied*, 96-825 (La. 5/10/96), 672 So.2d 928 (emphasis in original). But, the "right to recover attorney fees under La.R.S. 19:201 is contingent upon either the rendition of a final judgment to the effect that the expropriating authority cannot acquire the property, or the abandonment of the expropriation proceeding by the expropriating authority." *St. Tammany Par. Hosp. Serv., Dist. No. 2 v. Schneider*, 96-2798, p. 4 (La.App. 1 Cir. 2/20/98), 707 So.2d 156, 157. The jurisprudence has further defined a general rule that "absent a finding of bad faith or abuse, no damages are warranted when an expropriation suit by ordinary proceeding has been commenced, and later dismissed or abandoned under timely and appropriate circumstances." *St. Tammany Par. Hosp. Serv., Dist. No. 2 v. Schneider*, 00-247, p. 10 (La.App. 1 Cir. 5/11/01), 808 So.2d 576, 585.

Accordingly, we find no merit to the LCG's assertion that Bendel is precluded from seeking to recover attorney's fees and damages. We deem it just, legal, and proper based on the record in this case to amend the May 4, 2022 judgment to include a reservation of Bendel's right to seek attorney's fees and damages.

## V.

## CONCLUSION

The trial court's amended judgment dated May 26, 2022, is hereby vacated as absolutely null. We reinstate the trial court's May 4, 2022 judgment granting the motion to dismiss filed by Bendel Partnership (A Partnership in Commendam), and amend it to include the following language: "Bendel Partnership's rights regarding any claims for attorney's fees and/or damages are hereby reserved."

22

This matter is remanded to the trial court for further proceedings consistent with this opinion.  The Lafayette City-Parish Government is cast with all costs of this appeal.

**JUDGMENT VACATED; ORIGINAL JUDGMENT REINSTATED AND AFFIRMED AS AMENDED; AND REMANDED.**

23